644 P.2d 1266

STATE of Arizona, ex rel., Thomas E. COLLINS, Maricopa County Attorney, Petitioner,

v.

SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF MARICOPA; the Honorable I. Sylvan Brown, Judge, Respondent,

and

Frank SILVA, Jr., Real Party in Interest.

No. 15561.

Supreme Court of Arizona, In Banc.

Jan. 7, 1982.

Supplemental Opinion May 4, 1982.

Thomas E. Collins, Maricopa County Atty., Gregg A. Thurston, Deputy County Atty., Phoenix, for petitioner.

Robert L. Schwartz, Phoenix, for real party in interest.

GORDON, Vice Chief Justice:

This special action was brought to vacate the order of the Honorable Judge Brown granting defendant's motion in limine which requested that victims who had undergone hypnosis not be permitted to testify. Taking jurisdiction pursuant to A.R.S. Const.Art. 6, § 5(1), we uphold the ruling of Judge Brown and vacate the stay order so that the case may proceed to trial.

Over a three year period, from August, 1977 to May, 1980, eighteen reported rape incidents occurred in unpopulated areas in west Phoenix. There is some variance among the assaults but essentially they followed a similar pattern. Couples in vehicles were approached by a masked, heavyset male armed with a pistol and carrying what the state characterizes as a "rape kit," consisting of ropes, blindfolds, ground cloth, and toilet paper. In each instance the assailant informed the couple he was going to steal their car or take their money and proceeded to tie and blindfold the couple. After using the ground cloth for the rape, the assailant would use the toilet paper to clean the woman, and then untie the victims, return the paraphernalia to his tote bag, and leave the area on foot.

The Phoenix Police Department and the Maricopa County Sheriff's Office investigated the case for several years, taking statements, analyzing fingerprints, sending hair samples to the F.B.I. lab, and increasing patrols in the area. To obtain addition-

al information on the identification of the assailant seven victims were hypnotized.

On July 1, 1980 defendant Silva was arrested as he approached an undercover decoy vehicle containing a male and female officer in plainclothes. Silva was wearing a mask, armed with a pistol, and carrying the "rape kit."

Silva was charged with forty felony counts involving kidnapping, sexual assault (under the new criminal code for the post-October 1, 1978 crimes), and rape (under the old criminal code for the pre-October 1, 1978 crimes). The charges are contained in two separate cause numbers and have been consolidated for trial.

Silva's appointed counsel became aware of our decision in *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981), and filed a motion in limine to preclude the testimony of the seven previously hypnotized witnesses. *Mena, supra*, was handed down after the Rule 16.1(b), Arizona Rules of Criminal Procedure, deadline precluding any further pretrial motions. Judge Brown held an evidentiary hearing and granted defendant's motion in limine, thereby precluding any testimony of the seven witnesses at trial. The state then filed this Special Action. Necessary additional facts will be related as we address the specific issue.

### TIMELINESS OF MOTION IN LIMINE

■ At the outset the state argues that defense counsel should have been precluded from asserting the motion in limine under Rule 16.1(b), Arizona Rules of Criminal Procedure. The defense's motion, addressing the admissibility of the testimony of persons previously hypnotized, is treated as a motion to suppress by this Court and must comply with the time constraints of Rule 16.1. A motion in limine is not addressed by name in our rules of criminal procedure but,

"[A]ppears to be frequently used, however, to exclude anticipated prejudicial evidence before the evidence is actually offered by the opposing party. It is apparent that in criminal cases, a 'motion in limine' is nothing more than a motion to suppress specifically authorized by Rule 16 * * *."

*State v. Rodriguez*, 126 Ariz. 28, 30, 612 P.2d 484, 486 (1980). Rule 16.1(c) reads:

"Any motion * * * not timely raised under Rule 16.1(b) shall be precluded, unless the *basis therefor was not then known*, and by the exercise of *reasonable diligence* could not then have been known, and the party raises it promptly upon learning of it." (Emphasis added.)

In this case the deadline for filing motions was December 19, 1980. This Court's decision in *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981), was not filed until February 3, 1981. Defense counsel's motion in limine was filed on May 26, 1981. Exercising reasonable diligence defense counsel could not have anticipated the modification in the law. Further in considering the permitted time periods for a Motion for Rehearing and opposition to the same and the lag time before the decision appears in the advance sheets of the legal reporters, we cannot say that defense counsel did not raise the issue "promptly upon learning of it."

■ The applicable standard of review for the instant motion in limine is that a trial judge's ruling will not be disturbed absent a clear abuse of discretion. *State v. Superior Court*, 128 Ariz. 583, 627 P.2d 1081 (1981); *State v. Dupuy*, 116 Ariz. 151, 568 P.2d 1049 (1977); *State v. Wright*, 125 Ariz. 36, 607 P.2d 19 (App.1979).

In this instance the trial judge indicated at the outset of the evidentiary hearing that *Mena, supra*, was a more definite pronouncement on the issue of posthypnotic testimony than *State v. La Mountain*, 125 Ariz. 547, 611 P.2d 551 (1980), and granted defendant's motion in limine excluding all testimony of witnesses who had undergone hypnosis.

The trial judge, noting that *Mena, supra*, had come down subsequent to the deadline for pretrial motions, did not find that the defendant's motion in limine was untimely. We do not find an abuse of discretion.

## TESTIMONY OF HYPNOTIZED WITNESSES

Six rape victims and one attempted rape victim underwent hypnosis between November, 1977 and January, 1980. The record indicates that prior to the hypnotic sessions at least some of the victims had given written statements to the sheriff's department.

Fred Fiore, an experienced deputy sheriff, conducted the hypnotic sessions. Deputy Fiore has been involved in forensic investigative hypnosis since 1977 and belongs to the following professional organizations: The Society of Investigative Forensic Hypnosis; The Association for the Advancement of Ethical Hypnosis; and The Arizona Society of Professional Hypnosis. The hypnotic sessions were recorded on audio tape although one tape was inaudible and another was lost or erased. A sheriff's deputy was present at all the hypnotic sessions. The record from the evidentiary hearing indicates that the questions put to the victims concerned the assailant's physical description, race, height, eyes, teeth, skin, voice, and any vehicles seen in the area.

For several centuries people have experimented with hypnosis. Some persons view the art of hypnotic induction as a mystical, spiritual occurrence while others attempt to scientifically or medically define it.

"Perhaps the most inclusive definition is one which is neither *per se* medical nor judicial: hypnosis is a 'sleeplike state that nevertheless permits a wide range of behavioral responses to stimulation.'"

Dilloff, *The Admissibility of Hypnotically Influenced Testimony*, 4 Ohio N.U.L.Rev. 1, 2 (1977) (quoting 9 Encyclopedia Britannica *Hypnosis* 133 (1974)).

Our concern today is that hypnosis, although still largely untested, has seen a great upsurge in use in the criminal justice system. It is not uncommon for police departments to pay for training of police officers in induction techniques or to have hypnotists on their payroll. *See* Margolin, *Hypnosis-enhanced Testimony: Valid Evidence or Prosecutor's Tool?*, Trial, The National Legal Newsmagazine, Oct., 1981, at 42; Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 Calif.L.Rev. 313 (1980).

The testimony of persons who have undergone hypnosis is inadmissible for two distinct reasons: the process of hypnosis and its outcome is inherently unreliable; and to permit posthypnotic testimony would violate the defendant's sixth amendment right to cross examination.

## POSTHYPNOTIC TESTIMONY IS UNRELIABLE

### Suggestion

It is uncontested that we humans as social beings respond to outside stimuli throughout our waking hours. Educators have for decades studied the impact of positive and negative reinforcement and behavioral modification on animals and human subjects. People will react favorably or unfavorably to the tone of voice and body language of a speaker. During the state of hypnosis a person is even more susceptible to outside influences and may strain to produce the desired feedback. Two common characteristics of a subject in a hypnotic trance are hypersuggestibility and hypercompliance. *Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170 (1981). "Hypnotized persons, being extremely suggestible, graft onto their memories fantasies or suggestions deliberately or unwittingly communicated by the hypnotist." Diamond, *supra*, at 314. "[A] hypnotized subject is highly susceptible to suggestion, even that which is subtle and unintended." *State v. Mack*, 292 N.W.2d 764, 768 (Minn. 1980). Suggestions implanted wilfully or unwittingly linger with the hypnotized person. The previously hypnotized witness can sincerely believe these suggestions to be what actually occurred. In "a series of laboratory tests * * * false guilt was induced in experimental subjects through hypnosis. The subjects were so convinced of their guilt that they were unable to pass a lie detector test thereafter." Margolin, *supra*, at 43–44. The admissions of guilt, although objectively untrue, were sincerely

believed by the subjects and registered as truths on the polygraph. The hypnotist may not be able to avoid the possibility of indicating that certain responses are desirable.

Hypnosis is typically employed by authorities where there is little evidence and the victim of the crime is extremely enthusiastic to aid the police in any manner. "[T]he subject is so susceptible to suggestion and receptive to the hypnotist's verbal and non-verbal communications, the subject may respond in accordance with what he or she perceives the desired response to be, in order to 'please' the hypnotist." Comment, Hypnosis: *A Survey of Its Legal Impact,* 11 Sw.U.L.Rev. 1421, 1442 (1979). "Even when the hypnotist consciously attempts to avoid emitting signals, the problem may not be avoided. The hypnotic individual need not receive direct suggestions in order to try to please the hypnotist." *Commonwealth v. Nazarovitch,* 496 Pa. at 104, 436 A.2d at 174 (citing *Levitt, The Use of Hypnosis to 'Freshen' the Memory of Witnesses or Victims,* Trial, The National Legal News-magazine, April, 1981 at 57).

"The hypnotized subject may respond to implicit stimuli unintentionally emanating from the hypnotist, and unrecognized by him. The desire to please the hypnotist may induce the subject to mirror the attitude detected in the hypnotist's questions and his behavior. A further complicating factor involves the subject's own beliefs and expectations regarding the appropriate behavior for hypnotized individuals. In conclusion, then, if the hypnotist is unaware of the source of the response, or is not cognizant of its significance to the subject, any conclusions drawn regarding the reliability or veracity of the response might be inaccurate and misleading."

Spector & Foster, *Admissibility of Hypnotic Statements: Is The Law of Evidence Susceptible?,* 38 Ohio St.L.J. 567, 578 (1977).

This Court is not intimating that police authorities in this state would purposefully attempt to elicit responses they desired from a hypnotized subject. But as in the present case, other stimuli beyond the obvious leading question could and may have induced the subject to answer in a particular way. The record of the evidentiary hearing before us indicates that Detective Fiore knew that the young women he hypnotized and questioned were involved in the "ski mask rapist" case. Detective Fiore admitted that the hypnotized women could have been influenced in subtle ways by such things as the hypnotist's clothing, the environment in which the hypnosis was undertaken, or the presence of police officers in the room. The hypnotic sessions in question took place at the Maricopa County Sheriff's Office, not in a neutral environment. The young women were certainly anxious to assist the police in the pursuit of the man that had accosted them and may have reacted in the appropriate way, that is, the way that met the approval of the hypnotist.

The technique of posthypnotic suggestion enables the subject to recall posthypnotically what transpired during the session. The grave danger is that what subjects "remember" during the session will become their permanent memory. The experts on hypnosis seriously doubt if a suggestion-free hypnotic session can be conducted. This Court will not take a position on the question of whether a suggestion-free session is possible, but we cannot approve posthypnotic testimony in a criminal trial where a witness may be testifying from a memory influenced by undetectable suggestion.

*Confabulation*

The human mind assimilates information through sensory signals—what is seen, felt, heard, and smelled. Hypnosis is often viewed as a tool to enhance memory. Admittedly there are instances where a person will be unable to recall a phone number or license plate and then successfully "regains" this memory loss through hypnosis. We can only remember what was initially experienced through our senses, however. For example, if it is dark and perception is impaired hypnosis cannot retrieve a memory of a perception that never existed. These remarks lead us to another concern

of hypnotically induced testimony—the willingness of subjects to "fill in the gaps" in their memories, that is, to confabulate. "[S]ince memory consists of perception, registration and recall, if the elements of perception or registration are missing, hypnosis will not aid the subject's memory, since there is nothing to recall." Kadish, Brofman, Peskin & Baccus, *The Polygraph, Hypnosis, Truth Drugs and the Psychological Stress Evaluator: Admissibility in a Criminal Trial*, 4 Am.J. Trial Advocacy 593, 607 (1981).

"The hypnotized subject is influenced by a need to 'fill gaps.' When asked a question under hypnosis, rarely will he or she respond, 'I don't know,'" *Mack*, 292 N.W.2d at 768. "It is also possible for a subject to imagine certain events out of whole cloth. * * * In this latter situation, the subject may recall fabricated memories after he has been brought out of a hypnotic trance and believe them to be true and accurate." Dilloff, *supra*, at 5.

> "'The hypnotic suggestion to relive a past event, particularly when accompanied by questions about specific details, puts pressure on the subject to provide information for which few, if any, actual memories are available. This situation may jog the subject's memory and produce some increased recall, but it will also cause him to fill in details that are plausible but consist of memories or fantasies from other times. It is extremely difficult to know which aspects of hypnotically aided recall are historically accurate and which aspects have been confabulated * * *. Subjects will use prior information and cues in an inconsistent and unpredictable fashion; in some instances such information is incorporated in what is confabulated, while in others the hypnotic recall may be virtually unaffected.'"

*State v. Hurd*, 86 N.J. 525, 537–540, 432 A.2d 86, 92–93 (1981) (quoting Orne, *The Use and Misuse of Hypnosis in Court*, 27 Int'l J. Clinical & Experimental Hypnosis 311, 317–318 (Oct.1979)).

Dr. Bernard Barber, a specialist called by the state at the evidentiary hearing, noted that subjects confabulate during hypnosis. Hence, implicit in the use of forensic hypnosis are the dangers of confabulation and of eager subjects providing the "clue" to crack the case by filling in their memory with the "appropriate responses."

*Incorrect Recall*

Another concern over the use of hypnotically induced recall during trial is that it may be totally incorrect. In a recent Arizona Court of Appeals case the victim's posthypnotic recall of the circumstances of the crime materially differed from the statements she had given to the police prior to the hypnosis session.

"Immediately after the crime, the victim told the police officers that the license plate number of her assailant's car was PG*P* 112. His actual license number was PG*B* 112. * * * Under hypnosis the victim stated that the license number was P—121, and she was unable to remember the other letters." (Emphasis in original.)

*State v. Grier*, 129 Ariz. 279, 282, 630 P.2d 575, 578 (App.1981). This case demonstrates that a witness can recall circumstances incorrectly. In *Grier* the mistaken hypnotic memory helped the defendant. But the peril exists that the erroneous recall could implicate an innocent person where a conviction rests on the weight given to the hypnotic testimony.

*Purposeful Lying*

A person in a hypnotic trance can willfully lie. The problem arises where the subject wants to implicate a suspect or "remember" particular information that will facilitate the police investigation. "The authorities state that while hypnosis often can produce remarkably accurate recall, it is also prone to yield sheer fantasy, *willful lies*, or a mixture of fact with gaps filled in by fantasy." (Emphasis added.) *Hurd*, 86 N.J. at 538, 432 A.2d at 92. "Most authorities agree that a person can lie while under hypnosis. However, many laymen believe that the power of hypnosis, clothed in its veil of mystery, prevents willful deception." Dilloff, *supra*, at 5.

*Undue Weight Given By The Jury*

Hypnosis is cloaked in a veil of mysticism to the layperson. It seems to be a magical thing indeed that can produce fantastic recall and startling results. A jury is likely to place undue emphasis on what transpired during a hypnotic session. "[A] great danger in the use of hypnosis is the credibility which laymen commonly associate with the technique." Dilloff, *supra*, at 9. Opposing counsel, voicing the concerns noted by this Court, could attempt to impeach either the hypnotic induction technique or the hypnotist, but it is our opinion that a typical juror will place greater emphasis on posthypnotic testimony than it warrants.

*Hypnotic Inducement Not Scientifically Reliable*

The hypnotic process and the memory that is "reconstructed" is a matter of controversy. See 9 Encyclopedia Britannica *Hypnosis* 133, 137 (1979). The admissibility of posthypnotic testimony can be likened to that of polygraph and truth serum results. *See* Kadish, *supra; People v. Diggs,* 112 Cal.App.3d 522, 169 Cal.Rptr. 386 (1980). The underlying principles of hypnotic procedure must gain general acceptance by the experts in the field in order that its validity be recognized by this Court. *State v. Mena,* 128 Ariz. 226, 624 P.2d 1274 (1981); *see Scales v. City Court,* 122 Ariz. 231, 594 P.2d 97 (1979); *People v. Kelly,* 17 Cal.3d 24, 130 Cal.Rptr. 144, 549 P.2d 1240 (1976).

There is little agreement among the authorities and courts on the issue of the admissibility of posthypnotic testimony on the basis of its scientific reliability. In *Hurd, supra,* although the New Jersey high court permitted the hypnotically refreshed testimony if sufficient safeguards were followed, the hypnotic testimony was likened to the results of a polygraph examination or voice print analysis.

"[T]he credibility of recall stimulated by hypnosis depends upon the reliability of the scientific procedure used. If the procedure is not capable of yielding reasonably reliable results, then its probative value may be outweighed by the risks entailed in its use in a criminal trial." *Hurd,* 86 N.J. at 536, 432 A.2d at 91.

In *Hurd* the court goes on to cite the dangers of prejudice to the defendant of eyewitness identification, confusion of the jury by expert testimony, and the tremendous consumption of trial resources if the reliability of hypnotic induction were to be litigated in each case. The New Jersey court held that hypnosis is not a truth determining process but a procedure to restore memory, therefore hypnosis is reliable if it is able to yield recollections as accurate as those of an ordinary witness. This Court disagrees with the reasoning of *Hurd* and takes the position that until hypnosis is recognized and generally accepted in the scientific community as a reliable tool to enhance memory accurately it is inadmissible in a criminal trial. We agree that

"Although hypnotically-adduced 'memory' is not strictly analogous to the results of mechanical testing, we are persuaded that the *Frye* rule is equally applicable in this context, where the best expert testimony indicates that no expert can determine whether memory retrieved by hypnosis, or any part of that memory, is truth, falsehood, or confabulation * * *. Such results are not scientifically reliable as accurate."

*Mack,* 292 N.W.2d at 768.

*Safeguards Cannot Insure Posthypnotic Testimony Is Reliable*

Several courts have chosen to permit hypnotically recalled testimony if requisite safeguards are taken to avoid the pitfalls of a hypnotic session. It is this Court's opinion that although proper safeguards should be used by the police if hypnosis is used during investigations, these safeguards cannot insure that hypnotically recalled testimony is reliable and therefore cannot render it admissible. A recent Massachusetts case *Commonwealth v. Juvenile,* —— Mass. ——, 412 N.E.2d 339 (Mass.1980), remanded the case to the trial court requesting findings concerning the hypnotic procedures. The Court noted, "It may be that we will conclude, as a matter of law, that no procedures are adequate." 412 N.E.2d at 343.

Safeguards cannot render the hypnotically recalled testimony reliable and therefore admissible.

"[A] complete record of the hypnotic experience is never possible for * * * influences exerted both before and after the hypnotic session become integrated into the hypnotic experience and significantly distort the validity of recall."

Diamond, *supra*, at 339. Videotaping of the pre- and posthypnotic discussions may lessen the possibility of suggestion but subjects react unconsciously to the place of hypnosis, the status of the hypnotist, and the mere suggestion of being hypnotized. The effect of these factors in any particular case cannot be documented for a jury view. Therefore, procedural safeguards do not render hypnotically recalled testimony admissible.

*Hypnosis During The Investigative Stage*

Although the unreliability of hypnosis renders it improper at the judicial stages of a prosecution, this Court recognizes that hypnosis has proven to be a valuable investigative tool. This Court does not wish to encourage mass hypnotic induction of potential witnesses because of the inherent dangers in the process. Resolutions have been adopted by the two major professional associations in the hypnotic field condemning the employment of hypnosis by minimally trained police personnel. *See* Margolin, *supra*, at 42–43. Without formally adopting these standards we suggest that those involved in the criminal process adhere to the procedural safeguards set forth in the margin.[1]

We note that if police investigators make the decision to hypnotize an individual, any corroborating evidence subsequently obtained is admissible in a criminal trial subject to other evidentiary objections. Corroborating evidence is not susceptible to the same dangers of unreliability as is posthypnotic testimony. There is no threat that this evidence has been confabulated or has been suggested by the hypnotist.

In conclusion, the use of hypnosis during the investigative stage is permissible if used with great reserve by trained personnel with reasonable safeguards.

## VIOLATION OF DEFENDANT'S RIGHT TO CONFRONTATION

■■■ Defendants have a constitutional right to confront witnesses against them. U.S.Const. amend. VI. This right is fundamental and made obligatory on the states by the fourteenth amendment. *Smith v. Illinois*, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968). The right of confrontation embodies the right of defendants to cross examine the witnesses against them.

"[T]he right of cross-examination is included in the right of an accused in a criminal case to confront the witnesses against him. And probably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case."

*Pointer v. Texas*, 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923, 926 (1965). " 'Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without

1. 1. The hypnotic session should be conducted by a trained psychologist or psychiatrist. The hypnotist should be an independent party not affiliated with the prosecutor's office or the defense.

2. The hypnotic session should be conducted in a neutral environment.

3. Information necessary for the hypnotist to effectively question the subject should be in written form.

4. The hypnotist should question the subject in detail prior to the hypnotic session to ascertain what his or her prehypnotic memory consists of.

5. The hypnotic session and any major contacts between the hypnotist and the subject should be video-taped and preserved so that the opposing party may view the session.

6. Only the hypnotist and subject should be present during the session.

7. The hypnotist should take all precautions to avoid purposeful suggestion.

*See State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981) (adopting procedural safeguards suggested by Dr. Orne); *State v. Mack*, 292 N.W.2d 764 (Minn.1980) (noting, without adopting, safeguards recommended by Dr. Orne.)

which the jury cannot fairly appraise them.'" *Smith v. Illinois*, 390 U.S. at 132, 88 S.Ct. at 750, 19 L.Ed.2d at 959. The right to cross examine witnesses would be an empty right were a defendant not afforded the opportunity to meaningfully, effectively cross examine. "If the right to *effective* cross examination is denied, constitutional error exists without the need to show actual prejudice." (Emphasis added.) *Skinner v. Cardwell*, 564 F.2d 1381, 1388 (9th Cir. 1977), *cert. denied*, 435 U.S. 1009, 98 S.Ct. 1883, 56 L.Ed.2d 392 (1978).

The concern in the area of posthypnotic testimony is that posthypnotic memory may be different than prehypnotic memory. This memory alteration may result from purposeful or unwitting cues given by the hypnotist, the phenomenon of confabulation, and the need for the subject to achieve some sense of certainty within his or her own mind. The basic problem is that if a witness sincerely believes that what he or she is relating is the truth, they become resistant to cross examination and immune to effective impeachment to ascertain the truth.

"In the case of hypnotically induced memories, the violation of the accused's right to confrontation is much more basic than simply a delayed cross-examination. * * * [I]t is quite possible that the witness who emerges from hypnosis is not the same witness who entered into hypnosis. Under such a circumstance, there would be no *real confrontation* of the witness who might conceivably be the key to conviction or acquittal. Instead, the 'new' witness is convinced that the newly 'remembered' evidence is truthful, and is therefore immune to the rigors of cross-examination." (Emphasis added.)

Comment, *supra*, 11 Sw.U.L.Rev. at 1445.

The new memory of the witness may be wholly or partially fabricated and has been described by authors as pseudomemory. " 'Unfortunately, such pseudomemories can and often do become incorporated into the individual's memory store as though they had actually happened * * * [and if such memories] are eminently plausible, there is

no way for either the hypnotist or the subject or a jury to distinguish between them and actual recall of what occurred.'" Margolin, *supra*, at 44. "[T]he procedure can bolster a witness whose credibility would easily have been destroyed by cross-examination but who now becomes quite impervious to such efforts, repeating one particular version of his story with great conviction." Margolin, *supra*, at 44 (quoting Orne, *The Use and Misuse of Hypnosis In Court*, 27 Int'l J. Clinical & Experimental Hypnosis 311, 332 (Oct.1979)).

"Furthermore, the hypnotic subject, upon awakening, is often inbued with a confidence and conviction as to his memory which was not present before. Prehypnosis uncertainty becomes molded, in light of additional recall experienced under hypnosis, into certitude, with the subject unaware of any suggestions that he acted upon or any confabulation in which he engaged. The subject's firm belief in the veracity of his enhanced recollection is honestly held, and cannot be undermined through cross-examination."

*Commonwealth v. Nazarovitch*, 496 Pa. at 105, 436 A.2d at 174.

The recalling of events or creating of a new memory under hypnosis cements a witness' story, and the testimony retold in minute detail becomes very convincing. The insistent manner of the witness and the apparent belief in the posthypnotic version of the occurrence may deprive the jury of the value of observing the demeanor of a witness as it would have been absent the hypnotic session. "The right to confrontation granted to defendants by the Sixth Amendment to the United States Constitution is also a valuable right for the trier of fact, allowing the witness's demeanor to be observed and his credibility weighed." *State v. Thomas*, 110 Ariz. 120, 125, 515 P.2d 865, 870 (1973).

If the witness honestly believes he or she is telling the truth in good faith, there may be no way to test his or her subjective belief to ascertain the objective truth.

"[T]he oath or affirmation loses its meaning, for whilst the witness may be prepar-

ed to tell the whole truth and nothing but the truth as he or she sees it, what the witness honestly believes to be truth could be a purely fictitious piece of information planted in the mind of the witness during hypnosis. Even given the good faith of the hypnotist, there remains a real danger that the subject in the trance state could pick up subtle verbal cues from the hypnotist * * *."

Haward & Ashworth, *Some Problems of Evidence Obtained by Hypnosis*, 1980 Crim. L.Rev. 469, 476.

In the case before us the hypnotist Detective Fiore testified that hypnosis could change a person's memory and a witness could be thoroughly convinced of the truth of an objectively proven untruth.

Because of the unreliability of posthypnotic testimony and the denial of the defendant's fundamental right to effective cross examination, posthypnotic testimony is inadmissible in a criminal trial.

### PROSPECTIVE APPLICATION

We now consider whether the inadmissibility of posthypnotic testimony is to be retrospectively or prospectively applied in criminal cases. The United States Constitution does not prohibit nor require the retrospective effect of judicial rulings. *See Brown v. Louisiana*, 447 U.S. 323, 100 S.Ct. 2214, 65 L.Ed.2d 159 (1980); *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). Nor is retroactive implementation automatic depending on the particular constitutional provision involved. *Brown, supra; State v. Smith*, 112 Ariz. 321, 541 P.2d 918 (1975). "A state is free under the Constitution to make a choice for itself between the principle of forward operation of a ruling and that of relation backward." *State v. Gates*, 118 Ariz. 357, 359, 576 P.2d 1357, 1359 (1978).

The United States Supreme Court has given us guidance in determining when principles should be retroactively applied. We should examine: "(a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards." *Brown*, 447 U.S. at 328, 100 S.Ct. at 2219, 65 L.Ed.2d at 165 (quoting *Stovall v. Denno*, 388 U.S. 293, 297, 87 S.Ct. 1967, 1970, 18 L.Ed.2d 1199, 1203 (1967)). *See also Halliday v. United States*, 394 U.S. 831, 89 S.Ct. 1498, 23 L.Ed.2d 16 (1969); *Desist v. United States*, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969).

The purpose of the holding in *Mena* and the present case is to exclude from a criminal trial posthypnotic testimony because of its basic unreliability. "The extent to which a condemned practice infects the integrity of the truth-determining process at trial is a *'question of probabilities.'*" (Emphasis added.) *Stovall v. Denno*, 388 U.S. at 298, 87 S.Ct. at 1970, 18 L.Ed.2d at 1204 (quoting *Johnson v. New Jersey*, 384 U.S. 719, 729, 86 S.Ct. 1772, 1778, 16 L.Ed.2d 882, 890 (1965)). The purpose of the *Mena* rule does not warrant the reexamination of unknown numbers of jury verdicts. Not every refinement of the law should result in the rejuvenation of post-conviction appeals. Additional safeguards present during trial minimize the possibility of the miscarriage of justice. The purpose of the rule in *Mena* " [does] not clearly favor either retroactivity or prospectivity,'" *Brown*, 447 U.S. at 328, 100 S.Ct. at 2219, 65 L.Ed.2d at 165, therefore, we must examine the second and third criteria set out by the Supreme Court.

The reliance police authorities placed on the prior law is the second criterion in deciding if a principle should be retroactively applied. The apparent reliance of the police in the hypnosis area clearly weighs in favor of the prospective application of *Mena* and the case before us. There was no clear statement of the law proscribing the use of posthypnotic testimony prior to *Mena*. The police were not on notice pre-*Mena* that placing persons under hypnosis would then preclude their testimony at a subsequent trial. The argument could be made that the police had notice of the incompetency of previously hypnotized witnesses after *State v. La Mountain*, 125 Ariz. 547, 611 P.2d 551 (1980). *Mena*, however, as

was noted by the trial judge below, is a much clearer statement of this Court's position on posthypnotic testimony. Therefore, the reliance that the police placed on the admissibility of the testimony of persons hypnotized pre-*Mena* operates in favor of *Mena* having only prospective application. "The point of reliance is critical, not because of any constitutional compulsion, but because it determines the impact that newly articulated constitutional principles will have upon convictions obtained pursuant to investigatory and prosecutorial practices not previously proscribed." *Jenkins v. Delaware*, 395 U.S. 213, 218, 89 S.Ct. 1677, 1680, 23 L.Ed.2d 253, 259 (1969).

The third criterion enunciated by the United States Supreme Court is the effect of retroactive application on the administration of justice.

"We are reluctant to apply a constitutional rule of criminal procedure retroactively as '[t]o characterize a past proceeding as unconstitutional and therefore void reflects seriously on the integrity of the law, * * * weakens the confidence of those who trusted in the existence and validity of the rule and undermines the doctrine of the finality of prior determinations.'"

*State v. Ray*, 114 Ariz. 380, 383, 560 P.2d 1287, 1290 (1977) (quoting in part *State v. Smith*, 112 Ariz. 321, 541 P.2d 918 (1975)). See *Linkletter, supra.*

It is possible that juries in Arizona have convicted defendants in trials where posthypnotic testimony was introduced. But the law is dynamic. It is a continuum of succeeding redefinitions. Not every refinement in the law should call into question all prior convictions. Justice does not demand judicial reexamination of all criminal trials for each new advancement in judicial thinking. The judiciary could not function if there was never any finality to decisions. It is for this reason that only where there is a denial of a basic right of constitutional magnitude that is correctable will retrospective application be invoked. This is not the case here.

There is practical consideration in addition to the taxing of trial and appellate courts in denying the retroactive employment of *Mena*. The fact that a witness has undergone hypnosis may not be in the record, and therefore an appellate court would be handicapped in discovering this information.

■ Because of the unforeseen change in the law, the burden retrospective application would place on the administration of justice, and the need for finality, we hold *Mena* to be prospective only.

In establishing that the holdings of *Mena* and the present case are to be applied prospectively, we next must decide at what point in time will the application become effective. We hold that any person hypnotized post-*Mena* is incompetent to testify. Any person hypnotized pre-*Mena* but who testified post-*Mena* or who has not yet testified is incompetent to testify. We further hold that any conviction presently in the appeals process in which there was hypnotically recalled testimony and where the testimony and hypnosis took place pre-*Mena* will be examined on a case-by-case basis to determine if there was sufficient evidence, excluding the tainted testimony, to uphold the conviction. In other words, the question in these cases is whether the introduction of posthypnotic testimony was harmless error. The time of the mandate of *Mena* is the controlling date. In the case before us seven of the eighteen reported rape victims were hypnotized. Even though the hypnotic sessions occurred prior to *Mena* the hypnotized witnesses have not yet testified and are incompetent to testify at the pending trial.

This Court is cognizant that its holding is not purely prospective but has concluded that in balancing the competing interests this was the most equitable place to draw the line. This dilemma

"highlights the problem inherent in prospective decision-making, *i.e.*, some defendants benefit from the new rule while others do not, solely because of the fortuities that determine the progress of their cases from initial investigation and arrest

to final judgment. The resulting incongruities must be balanced against the impetus the technique provides for the implementation of long overdue reforms, which otherwise could not be practicably effected. Thus, raising the specter of potential anomalies does not further the difficult decision of selecting the precise event that should determine the prospective application of a newly formulated constitutional principle.

"Once the need is established for applying the principle prospectively as the Supreme Court of New Jersey has pointed out, 'there is a large measure of judicial discretion involved in deciding * * * the time from which the new principle is to be deemed controlling.'"

*Jenkins*, 395 U.S. at 218, 89 S.Ct. at 1680, 23 L.Ed.2d at 259 (quoting *State v. Vigliano*, 50 N.J. 51, 65–66, 232 A.2d 129, 137 (1967)).

It is hereby ordered that the petitioner's prayer for relief is denied and the stay order vacated.

STRUCKMEYER and CAMERON, JJ., concur.

HOLOHAN, Chief Justice (dissenting):

The decision of the court in this case effectively ends the use of hypnosis as a memory aid in this jurisdiction. The rule fashioned by the court is that the pretrial use of hypnotism precludes the use of the witness who was subjected to hypnotism. Faced with such a ruling by this court no law enforcement agency can risk using hypnosis because the person subjected to hypnosis cannot thereafter be used as a witness. I disagree with the court's position and I reject the unfortunate rule fashioned by this court.

Since our decisions in *State v. La Mountain*, 125 Ariz. 547, 611 P.2d 551 (1980) and *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981), further research has convinced me that our position is wrong and should be changed. The problems described in our two earlier cases and the one at issue are, in my judgment, magnified all out of proportion to reality. If we apply the court's concern with suggestivity and difficulty of cross-examination to all witnesses, we would not allow a lawyer to talk to his witnesses before trial, we would exclude most identification testimony, and relatives and friends of a party would be excluded as witnesses.

One of the court's authorities acknowledges that "conventional eyewitness testimony is fraught with grave problems of inaccuracy and distortion," but apparently the author feels that hypnotism is too extreme. Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness*, 68 Calif.L.Rev. 313, 341–42 (1980).

The use of hypnotically induced testimony is not limited to the prosecution. It was favorable to the accused in *State v. Grier*, 129 Ariz. 279, 630 P.2d 575 (App.1981), and it would indeed be unfortunate if the defense were prevented from using the testimony of a witness which might exonerate the defendant.

It is important to note that the issue in this case is not whether the hypnotist may testify in the case that the witness told him the truth or, for that matter, testify as to what the witness said under hypnosis. The issue is whether the witness may testify at trial after having, sometime in the pretrial period, been hypnotized.

This court has ruled that such witnesses may not even be called to testify in the case. This is an extreme position. Some courts which preclude the witness from relating posthypnotic refreshed testimony allow the witness to testify to matters remembered prior to hypnosis. *Emmett v. State*, 232 Ga. 110, 205 S.E.2d 231 (1974); *Creamer v. State*, 232 Ga. 136, 205 S.E.2d 240 (1974); *State v. Mack*, 292 N.W.2d 764 (Minn.1980).

Some courts have allowed the admission of hypnotically refreshed testimony of witnesses, ruling that hypnosis is a factor affecting credibility not admissibility. *United States v. Awkard*, 597 F.2d 667 (9th Cir. 1979), *cert. denied*, 444 U.S. 885, 100 S.Ct. 179, 62 L.Ed.2d 116 (1979); *State v. McQueen*, 295 N.C. 96, 244 S.E.2d 414 (1978).

A few courts have suggested some safeguards to be followed before admitting testimony of a witness who had undergone hypnosis prior to trial. *United States v. Adams*, 581 F.2d 193 (9th Cir. 1978), *cert. denied*, 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *People v. Smrekar*, 68 Ill.App.3d 379, 24 Ill.Dec. 707, 385 N.E.2d 848 (1979); *People v. Lucas*, 107 Misc.2d 231, 435 N.Y.S.2d 461 (N.Y.Sup.1980). The *Adams* court suggested at a minimum that complete stenographic records be made of the interview of the hypnotized person, but an audio or video recording would be more helpful.

In *Smrekar* the Illinois appellate court suggested four requirements before admitting testimony of witnesses who had previously undergone hypnosis. They are: (1) that the hypnotist be shown to be competent; (2) that the evidence shows no undue suggestion; (3) that the identification be corroborated by evidence unknown to the witness when hypnotized; and (4) that the witness be shown by the evidence to have had an opportunity to observe the accused.

The safeguards proposed by the New York court in *Lucas*, before hypnotically refreshed testimony is admitted in evidence, are much more extensive than those required by other courts. The requirements are that:

1. The expert hypnotist be trained in the mental health field;

2. The hypnotist should receive a written memo of facts from the police, so the court can know what information s/he knew prior to communicating with the witness;

3. The hypnotist be neutral, not affiliated with prosecution/defense;

4. Videotapes be made of all pre-, during, and post-hypnotic sessions;

5. Only the hypnotist and the subject should be present;

6. Pre-hypnosis, the subject should be examined by a mental health professional for mental or physical disorders and to determine the subject's mental competence;

7. Pre-hypnosis, the hypnotist should interview the subject and determine the extent of the subject's recollections in detail;

8. The hypnotist avoid all suggestions to the subject;

9. The court consider any evidence controverting or corroborating the witness' hypnotic statements.

Although the New York standards appear to be too restrictive, they are certainly an improvement over this court's "nothing." At least to give the court system the benefit of this useful procedure, which has been used for over a century in the medical field, I would adopt the New York safeguards for future cases.

The case at issue shows the value of hypnotism as an aid to the justice system. The police had no suspects. The witnesses were women who had gone through the trauma of rape. A deputy sheriff, Fred Fiore, whose qualifications are set forth in *State v. La Mountain, supra*, 125 Ariz. at 550, 611 P.2d at 554, employed hypnosis on the several witnesses to see if they could remember more details of the events of the rape. Audio tapes were made of each hypnotic session, although two of the tapes were inaudible. In five instances, the hypnotized witnesses provided information that had not appeared in their pre-hypnosis statements; almost all of this new information was subsequently corroborated after the accused was arrested.

Prior to trial the trial court held a hearing on the motion of the defense to exclude the testimony of any of the witnesses who had undergone hypnosis. The state presented as witnesses Fred Fiore, the hypnotist; two Maricopa County Sheriff's Office personnel; two of the hypnotized victims; and a psychologist, Dr. Barber. After the hearing, the trial judge found that the evidence and the tapes showed that the witnesses' statements were not affected by the hypnotic sessions, that the witnesses' pre-hypnotic written statements and statements to police were not tainted by the hypnosis, and that the dangers of undue suggestion had been obviated by the record-

ing of the sessions and by the preservation of the witnesses' pre-hypnotic statements. From my review of the record, I believe that the evidence supports the findings of the trial judge. However, the trial judge felt compelled to follow the previous decisions of this court in *La Mountain* and *Mena*, so he granted the defense motion and ruled that the witnesses who had undergone hypnosis were precluded from testifying in the case.

Despite the record made by the state which included the testimony of the psychologist, Dr. Barber, and the finding of the trial court, this court finds that witnesses who underwent hypnosis are "tainted" and no longer competent to testify to anything, and, in fact, they cannot be called as witnesses. It is indeed a sorry result when the victim of a rape cannot even take the stand to say she was raped. I do not find the reasons given for this court's decision to be convincing, and I, therefore, dissent from the decision.

HAYS, Justice (dissenting):

I concur in the dissent of Chief Justice Holohan.

## SUPPLEMENTAL OPINION

FELDMAN, Justice.

In our original opinion in this case, we held that a witness who had undergone hypnosis should not be permitted to testify. The State moved for a rehearing; that motion was granted by order dated March 2, 1982. This opinion follows the order granting the motion for rehearing.

The hypnosis question first arose in *State v. La Mountain*, 125 Ariz. 547, 611 P.2d 551 (1980), where we held that in a rape prosecution, the court erred in admitting hypnotically induced recall pertaining to identification; however, we concluded that the error was not prejudicial since the other evidence was sufficient to sustain the conviction. This decision was followed by *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981), in which we reversed the conviction, holding

that "until hypnosis gains general acceptance in the fields of medicine and psychiatry as a method by which memories are accurately improved without undue danger of distortion, delusion or fantasy, we feel that testimony of witnesses which has been tainted by hypnosis should be excluded in criminal cases." *Id.* at 231, 624 P.2d at 1279.

Hypnosis was not so easily to be put beyond us. The issue returned in the case *sub judice*, and in our original opinion, 131 Ariz. 180, 644 P.2d 1266 (1982) we repeated that because of its unreliability and the phenomena which interfere with the right of effective cross-examination, post-hypnotic recall testimony would be inadmissible in criminal trials. We extended the rule to the issue of competency, and held that any person who had been hypnotized would not be permitted to testify to hypnotically induced recall, and would also be incompetent to testify to *any* fact, even those which demonstrably had been recalled prior to hypnosis.

One week later, in *Lemieux v. Superior Court*, 131 Ariz. 214, 644 P.2d 1300 (1982), we held that these rules would be applicable to civil cases, at least to the extent that persons hypnotized subsequent to the mandate could not testify to matters discussed under hypnosis. Two other cases involving hypnotically induced testimony have been submitted for decision and are under advisement.

Thus, the motion for rehearing in this case has called into question both the holdings in the previous decisions and the hypnosis issues of the pending cases.

## PROPRIETY OF REEXAMINATION OF THE ISSUE

■ In *La Mountain* and *Mena*, four justices joined in the majority opinion and one member of the court concurred in the result.[1] In this case, three justices, including Justice Struckmeyer, concurred in the majority opinion, and two justices who had concurred only in the result of the previous

1. The composition of the majority was different   in both cases.

cases dissented. Justice Struckmeyer, who had joined in the majority opinion of the above cases, has retired and has been replaced by the author of this opinion.

The respondents here assert that the motion for rehearing is aimed at the reconstitution of the court and argue cogently that reconstitution by substitution of a judge with a different opinion from his predecessor should not cause the court to overturn an established principle of law.

A decent respect for the doctrine of *stare decisis* and a realization that the question is difficult, would ordinarily impel me to vote to deny rehearing, even though I might personally disagree with a portion of the original decision. However, where issues of important public policy are involved, each judge must vote his or her conviction, especially where the rule in question is not of long-standing duration and where no property rights have intervened.

> Since the time of the rendering of the original opinion and the motion for rehearing, there has been a reconstitution of this court. We do not believe that a mere fortuitous reconstruction of the court should be grounds for a rehearing, nor do we believe that a rehearing should be granted unless there is some cogent reason for so doing. However, in questions involving the public policy of the State of Arizona, re-examination of our previous decision is proper. See, *State ex rel. Nelson v. Jordan*, 104 Ariz. 193, 450 P.2d 383 (1969), appeal dismissed, *Jordan v. Arizona ex rel. Nelson*, 396 U.S. 5, 90 S.Ct. 24, 24 L.Ed.2d 4. See also basis for rehearing in *State ex rel. Morrison v. Thelberg*, 87 Ariz. 318, 350 P.2d 988 (1960).

*Caruth v. Mariani*, 11 Ariz.App. 188, 189, 463 P.2d 83, 84 (1970) (granting motion for rehearing of *Caruth v. Mariani*, 10 Ariz. App. 277, 458 P.2d 371 (1969)).

Thus, after consideration of the memoranda submitted on the motion for rehearing, we have reexamined the entire matter, and have *granted the motion for rehearing*. The facts were set forth in our original opinion and are as follows:

Over a three year period, from August, 1977 to May, 1980, eighteen reported rape incidents occurred in unpopulated areas in west Phoenix. There is some variance among the assaults but essentially they followed a similar pattern. Couples in vehicles were approached by a masked, heavy-set male armed with a pistol and carrying what the state characterizes as a "rape kit," consisting of ropes, blindfolds, ground cloth, and toilet paper. In each instance the assailant informed the couple he was going to steal their car or take their money and proceeded to tie and blindfold the couple. After using the ground cloth for the rape, the assailant would use the toilet paper to clean the woman, and then untie the victims, return the paraphernalia to his tote bag, and leave the area on foot.

The Phoenix Police Department and the Maricopa County Sheriff's Office investigated the case for several years, taking statements, analyzing fingerprints, sending hair samples to the F.B.I. lab, and increasing patrols in the area. To obtain additional information on the identification of the assailant seven victims were hypnotized.

On July 1, 1980 defendant Silva was arrested as he approached an undercover decoy vehicle containing a male and female officer in plainclothes. Silva was wearing a mask, armed with a pistol, and carrying the "rape kit."

Silva was charged with forty felony counts involving kidnapping, sexual assault (under the new criminal code for the post-October 1, 1978 crimes), and rape (under the old criminal code for the pre-October 1, 1978 crimes). The charges are contained in two separate cause numbers and have been consolidated for trial.

Silva's appointed counsel became aware of our decision in *State v. Mena*, 128 Ariz. 226, 624 P.2d 1274 (1981), and filed a motion in limine to preclude the testimony of the seven previously hypnotized witnesses. *Mena, supra*, was handed down after the Rule 16.1(b), Arizona Rules of Criminal Procedure, deadline

precluding any further pretrial motions. Judge Brown held an evidentiary hearing and granted defendant's motion in limine, thereby precluding any testimony of the seven witnesses at trial. The state then filed this Special Action. Necessary additional facts will be related as we address the specific issue.

The decisions in *La Mountain*, supra, *Mena*, supra, *Lemieux*, supra, and the original opinion in this case were based upon the following conclusions:

1. Hypnosis is not generally accepted "in the fields of medicine and psychiatry as a method by which memories are accurately improved without undue danger of distortion, delusion or fantasy ...." *State v. Mena*, 128 Ariz. at 231, 624 P.2d at 1279.

2. Hypnotically induced recall testimony is inherently unreliable because the testimony of the hypnotized witness may contain pseudomemory of "facts" which have been implanted due to suggestion by the hypnotist or confabulation by the subject in order to fulfill the implicit demand "received" from the hypnotist. Thus, the hypnotized person may unwittingly create plausible facts to fill gaps in his true recollection, so that his testimony contains as much fantasy as it does actual recall. Additionally, the hypnotized witness usually has as strong a belief in the pseudomemory as in the facts truly recalled, thus making it impossible to separate fact from fancy or to effectively cross-examine the witness. Therefore, evidence of hypnotically induced recall is inadmissible under any circumstances and for any purpose.

3. Because the previously hypnotized witness may be unable to separate unreliable, hypnotically induced recall "fact" from truly reliable, normally recalled "fact," the mere induction of hypnosis during the investigatory or preparatory phase of the case renders that witness absolutely incompetent to testify, even as to those matters which he or she may have remembered and stated prior to the induction of hypnosis.

Before determining whether to modify our previous decision in this case, we must reexamine each premise of the original opinion.

## THE TEST OF SCIENTIFIC ACCEPTANCE

■ The present test for admission of evidence obtained from use of a scientific principle, theory or discovery was derived from an early case which held that the results of a lie detector test were inadmissible even though proper foundation had been laid with respect to the training of the "expert" operator.

Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

We think the systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities ....

*Frye v. United States*, 293 F. 1013, 1014 (D.C.Cir.1923).

The *Frye* test has been applied in a variety of situations. *See, e.g., United States v. Tranowski*, 659 F.2d 750 (7th Cir. 1981) (photograph dating by mathematical and astronomical calculations); *United States v. Fosher*, 590 F.2d 381 (1st Cir. 1979) (expert testimony on the unreliability of eyewitness identification); *United States v. Kilgus*, 571 F.2d 508 (9th Cir. 1978) (forward looking infrared system); *United States v. Brown*, 557 F.2d 541 (6th Cir. 1977) (ion microprobic analysis of human hair); *United States v. McDaniel*, 538 F.2d 408 (D.C.Cir.1976) (spectrographic voice identification); *Ibn-Tamas v. United States*, 407 A.2d 626 (D.C.Ct.App. 1979) (methodology for identifying and studying battered women); *People v. Monigan*, 72 Ill.App.3d 87, 28 Ill.Dec. 395, 390 N.E.2d 562 (1979) (polygraph); *State v.*

*Stewart*, 116 N.H. 585, 364 A.2d 621 (1976) (polygraph); *People v. Smith*, 110 Misc.2d 118, 443 N.Y.S.2d 551 (1981) (odontological identification of bite marks); *State v. Thomas*, 66 Ohio St.2d 518, 423 N.E.2d 137 (1981) (expert testimony on "battered wife syndrome"); *State v. Washington*, 229 Kan. 47, 622 P.2d 986 (1981) (multi-system polymorphic enzyme analysis of blood); *State v. Canaday*, 90 Wash.2d 808, 585 P.2d 1185 (1978) (breathalyzer); *State v. Clawson*, W.Va., 270 S.E.2d 659 (1980) (hair analysis).

Arizona has adopted and followed the *Frye* test. *See, e.g., Scales v. City Court*, 122 Ariz. 231, 594 P.2d 97 (1979) (breathalyzer); *State v. Valdez*, 91 Ariz. 274, 371 P.2d 894 (1962) (polygraph). Accordingly, this was the test we considered in *Lemieux* and *Mena*.

Under the *Frye* rule, once the court determines the reliability of the procedure under the test of general acceptance, evidence resulting from use of the particular technique is admissible, subject to a foundational showing that the expert was qualified, the technique was properly used, and the results were accurately recorded.

*Frye* has been in use for almost 60 years without the development of any alternative as a *general* test of reliability. No such alternative has been seriously suggested in the cases or in the literature, nor does any occur to this court.

## ANALYSIS OF HYPNOSIS CASES AND THEIR RELATIONSHIP TO THE *FRYE* RULE

■ To a large extent, the decision on use of hypnotically induced recall turns on the resolution of a single question of policy. The true issue is whether *Frye* should be applied to determine the basic reliability of the new technique as a prerequisite for use in the courtroom, thus leaving only foundational questions for the trial court, or whether the trial court should be left free to decide both basic reliability and foundational questions on a case-by-case basis. The cases proceed along two separate lines, based not so much on how the court views hypnosis (there being a general consensus

that it presents a great deal of danger), but primarily on whether the court applies the *Frye* principle in making its determination.

The line of cases holding that recall refreshed by hypnosis is admissible begins with *Harding v. State*, 5 Md.App. 230, 246 A.2d 302 (1968), *cert. denied*, 395 U.S. 949, 89 S.Ct. 2030, 23 L.Ed.2d 468 (1969). In *Harding*, the court held the evidence was admissible on a showing that the previously hypnotized witness was testifying from her refreshed memory. A foundational showing was made by testimony of the psychologist who induced the hypnosis. He stated that there was "no reason to doubt the accuracy of the witness' recollections." *Id.* at 246, 246 A.2d at 311. There was no discussion of different scientific viewpoints or general scientific acceptance; the *Frye* test was not mentioned. In *State v. Temoney*, 45 Md.App. 569, 576, 414 A.2d 240, 244 (1980), *vacated on other grounds*, 290 Md. 251, 429 A.2d 1018 (1981), the Maryland court relied on *Harding* and again held hypnotically induced recall admissible. The court concluded that the *Frye* principle, adopted in *Reed v. State*, 283 Md. 374, 391 A.2d 364 (1978) (a spectrograph case), was inapplicable because the hypnosis issue did not involve expert testimony based upon a scientific procedure, but only the credibility of a witness' refreshed memory. 45 Md. App. at 577, 414 A.2d at 244.

The cases which followed *Harding* reached the same result in approximately the same manner. Thus, in *State v. Jorgensen*, 8 Or.App. 1, 9, 492 P.2d 312, 315 (1971), the court held that recollection refreshed by hypnosis and sodium amytal was admissible, citing *Harding*, and neither citing *Frye* nor discussing the test of general scientific acceptance. The same result was reached in *Clark v. State*, 379 So.2d 372, 375 (Fla.Ct. App.1979). In *State v. McQueen*, 295 N.C. 96, 119, 244 S.E.2d 414, 427–29 (1978), the North Carolina court relied upon *Harding* and *Jorgensen*, and held that the post-hypnotic recall was admissible, with all questions going to the weight of the testimony. The court did not discuss the *Frye* test, except to indicate that *State v. Foye*, 254

N.C. 704, 120 S.E.2d 169 (1961) (which held lie detector test results inadmissible, in part because of the lack of scientific acceptance) was inapplicable because hypnotic testimony was a simple question of recollection and the question of credibility was for the jury. 295 N.C. at 121–22, 244 S.E.2d at 429. In *People v. Smrekar*, 68 Ill.App.3d 379, 385–88, 24 Ill.Dec. 707, 712–14, 385 N.E.2d 848, 853–55 (1979), the Illinois court held the testimony was admissible; it did not discuss the *Frye* rule and merely alluded to a few citations in the medical literature which refer to hypnosis as "a valuable tool" to restore memory.

We make no attempt to cite all the "pro-hypnosis" cases. Suffice it to say that in these cases the *Frye* test is mentioned tangentially, if at all, and is not applied. It is interesting, however, that when the very court that decided *Harding* eventually applied the *Frye* rule to the hypnosis question, it came to a different result. In *Polk v. State*, 48 Md.App. 382, 427 A.2d 1041, 1048 (1981), the court reversed the lower court's ruling admitting hypnotically recalled testimony and remanded the case for determination of the procedure's general scientific acceptance.

Nevertheless, the *Harding* approach still retains vitality. In its most recent application, *Chapman v. State*, Wyo., 638 P.2d 1280, 1281–85 (1982), the Wyoming court held the evidence admissible, characterizing the question as one pertaining to the weight to be given to refreshed recollection. *Frye* was mentioned only by the two dissenters who relied on it as support for their view that hypnotically induced recall should be inadmissible. *Id.* at 1290.

In the second line of cases—primarily the more recent decisions—the courts have discussed the *Frye* test and applied it to the issues surrounding admission of hypnotically induced recall. These courts have almost unanimously agreed that the evidence is inadmissible. *See State v. Mena*, supra; *People v. Shirley*, 31 Cal.3d 18, 181 Cal.Rptr. 243, 641 P.2d 775 (1982); *People v. Gon-zales*, 108 Mich.App. 145, 161, 310 N.W.2d 306, 314 (1981); *State v. Mack*, Minn., 292 N.W.2d 764, 771 (1980); *State v. Palmer*, 210 Neb. 206, 313 N.W.2d 648, 655 (1981); *Commonwealth v. Nazarovitch*, 496 Pa. 97, 436 A.2d 170, 171–78 (1981). As the New Jersey Supreme Court has noted:

[The *Frye* standard] has previously been applied only to the results of physical tests such as radar, ... the polygraph, ... and voiceprints .... But we believe that the policy reasons embodied in the general acceptance standard are germane to hypnotically refreshed testimony as well.

Like the results of a polygraph examination or voiceprint analysis, the credibility of recall stimulated by hypnosis depends upon the reliability of the scientific procedure used. If the procedure is not capable of yielding reasonably reliable results, then its probative value may be outweighed by the risks entailed in its use in a criminal trial.... These risks include prejudice, jury confusion, and consumption of time and trial resources.... When hypnosis results in an eyewitness identification of the defendant, for example, the defendant is clearly prejudiced if there is not even a reasonable likelihood that the witness' memory was accurately revived. Because the introduction of hypnotically refreshed testimony will often require additional expert testimony ..., there is a potential for confusion of the issues and a tremendous consumption of trial resources. The potential disadvantages would be even greater if it were necessary to prove the lack of general acceptance of the procedure in every case as well as the unreliability of its use in the particular instance. These disadvantages may be justified by the probative worth of the evidence, as demonstrated by satisfaction of the general acceptance standard, before hypnotically refreshed testimony will be admissible.

*State v. Hurd*, 86 N.J. 525, 536–37, 432 A.2d 86, 91–92 (1981) (citations omitted).[2]

---

2. The New Jersey court, in *State v. Hurd*, 86 N.J. at 538–46, 432 A.2d at 94–97, applied *Frye* to the hypnosis problem, recognized the serious

The other cases in the "anti-hypnosis" line rely on other reasons for applying the *Frye* test. In *Commonwealth v. Nazarovitch,* 496 Pa. at 103, 436 A.2d at 173, the Pennsylvania Supreme Court pointed out that one reason for the application of the *Frye* standard is a fear that the jury may give increased weight to evidence based upon some scientific standard or procedure. Therefore, the court held that evidence developed in that manner should not be admissible without establishing that the technique is reliable and its results trustworthy. *Id.* at 110, 436 A.2d at 178. This showing is satisfied by general acceptance of the procedure in the relevant scientific community. In *Polk,* the Maryland Court of Appeals reasoned that induced recall cannot be disassociated from the underlying scientific method of hypnosis. 48 Md.App. at 394, 427 A.2d at 1048. It held, therefore, as we did in *State v. Mena,* 128 Ariz. at 231, 624 P.2d at 1279, that the *Frye* test must be applied. *Polk v. State,* 48 Md.App. at 394, 427 A.2d at 1048. In *State v. Mack,* the Minnesota Supreme Court reached the same conclusion, 292 N.W.2d at 765. In so holding, the court implied that any other rule would result in a case-by-case battle on the question of admissibility. This would be prohibitively expensive and would result in conflicting decisions.[3] *Id.,* 292 N.W.2d at 766.

We find the principles stated in the cases that have applied the *Frye* standard persuasive. Unlike voiceprints, fingerprints, blood alcohol analyses, and other techniques, the hypnosis issue is not centered upon an expert's interpretation of data or results obtained from physical tests. Hypnosis involves interrogation of a potential witness in an abnormal state of lessened consciousness and heightened suggestibility. No confession made by a suspect in that condition would be admissible and, indeed, the courts have uniformly held that statements made under hypnosis are inadmissible for substantive purposes. *See, e.g., People v. Hangsleben,* 86 Mich.App. 718, 728, 273 N.W.2d 539, 544 (1978); *Greenfield v. Commonwealth,* 214 Va. 710, 715–16, 204 S.E.2d 414, 418–19 (1974); McCormick on Evidence § 208, at 510 (2d ed. 1972); Annot., Admissibility of Hypnotic Evidence, 92 A.L.R.3d 442 (1979). Even the cases that favor admissibility of hypnotic recall concede that this method of refreshing recollection is "unusual," *Kline v. Ford Motor Co.,* 523 F.2d 1067, 1069–70 (9th Cir. 1975), and "carries a dangerous potential for abuse," *United States v. Adams,* 581 F.2d 193, 198 (9th Cir.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978).

Hypnosis has gained scientific recognition primarily as a therapeutic tool. Its forensic use as a means of ascertaining truth

dangers involved, and held the *Frye* test was satisfied only if use of hypnotically induced recall is limited to situations where strict standards are applied to the hypnosis procedure. These standards will be discussed at pp. 1287–1292 *infra.*

**3.** It is important to keep the *Frye* test in perspective. In any case involving the admissibility of expert opinion based on some technical or scientific method or procedure, there will be dispute over the conclusions to be reached, the competence of the respective experts and the method by which the scientific principles were applied. If hypnotically induced recall were to be admissible in Arizona, that problem would still have to be resolved. However, the threshold question with which we are dealing here is whether the procedure has gained sufficient acceptance in the scientific community to warrant an overall conclusion that when properly utilized it will give results which are sufficiently reliable so that the probative value out-

weighs the admitted dangers and resultant possibilities of prejudice.

> The question of the reliability of a scientific technique or process is unlike the question, for example, of the helpfulness of particular expert testimony ... in a specific case. The answer to the question [of] reliability ... does not vary according to the circumstances of each case. It is therefore inappropriate to view this threshold question of reliability as a matter within each trial judge's individual discretion. Instead, considerations of uniformity and consistency of decision-making require that a legal standard or test be articulated by which the reliability of a process may be established....
>
> [B]efore a scientific opinion will be received as evidence at trial, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field.

*Reed v. State,* 283 Md. 374, 381, 391 A.2d 364, 367–68 (1978).

presents insurmountable problems of reliability because the hypnotically refreshed "memory" may contain as much fiction as fact. Therefore, there is a substantial threshold question whether the danger of prejudice outweighs the probative value of hypnotically elicited recollection, even when the technique is properly applied. We feel that this question cannot be appropriately handled on a case-by-case basis, with the consequential danger of conflicting decisions and consumption of trial resources. The threshold standard, then, must be the *Frye* test, which, with all its shortcomings, serves the "salutary purpose of preventing the jury from being misled by unproven and ultimately unsound scientific methods."[4] *People v. Shirley*, supra, 31 Cal.3d at 53, 181 Cal.Rptr. at 263, 641 P.2d at 795.

> If there is a discernible thread distinguishing what is rigorously scrutinized as scientific evidence before admission from what is more generously received as relevant expert opinion, it is that any technique that in its application is likely to have an enormous effect in resolving completely a matter in controversy must be demonstrably reliable. Where, on the other hand, an expert opinion only helps a trier to interpret the evidence or is susceptible to evaluation from the trier's own knowledge, it will be received on a lesser showing of scientific certainty. Because "science" is often accepted in our society as synonymous with truth, there is a substantial risk of overweighting by the jury. The rules concerning scientific evidence are aimed at that risk.

4. McCormick suggests that the courts should abandon the *Frye* test and instead use the test formulated by the Federal Rules of Evidence and adopted in Rule 403, Arizona Rules of Evidence, 17A A.R.S. McCormick states:
> "General scientific acceptance" is a proper condition for taking judicial notice of scientific facts, but not a criterion for the admissibility of scientific evidence. Any relevant conclusions which are supported by a qualified expert witness should be received unless there are other reasons for exclusion. Particularly, probative value may be overborne by the familiar dangers of prejudicing or misleading the jury, and undue consumption of time. If the courts used this approach, in-

1 M. Udall & J. Livermore, *Law of Evidence* § 102, at 212 (2d ed. 1982).

We hold, therefore, that the *Frye* test is applicable to the question of hypnotically induced recall testimony. We reaffirm our statements to that effect in *State v. Mena*, 128 Ariz. at 231, 624 P.2d at 1279.

## RESULT OF APPLYING THE *FRYE* TEST TO HYPNOSIS

█ Applying the *Frye* test, we must first determine the relevant "scientific community" whose acceptance must be ascertained. Acceptance must be by those experts who are relatively disinterested and impartial and whose livelihood, therefore, is not intimately connected with approval of the technique. *People v. Barbara*, 400 Mich. 352, 376, 255 N.W.2d 171, 180 (1977). This requirement is not satisfied with testimony from a single expert or group of experts who personally believe the challenged procedure is accepted or is reliable. "[T]he court must be able to find that the procedure is generally accepted as reliable by the larger scientific community in which it originated." *People v. Shirley*, supra, 31 Cal.3d at 54, n. 32, 181 Cal.Rptr. at 264, 641 P.2d at 796. We hold, therefore, that the *Frye* test is satisfied when the court is able to conclude that disinterested and impartial experts, knowledgeable in the scientific specialty which deals with and uses such procedures or techniques, have come to recognize the methodology as having sufficient scientific basis to produce reasonably uniform and reliable results that will contribute materially to the ascertainment of the truth.

stead of repeating a supposed requirement of "general acceptance" not elsewhere imposed, they would arrive at a practical way of utilizing the results of scientific advances.
McCormick on Evidence § 203, at 491 (2d ed. 1972). This proposal, like the *Frye* standard, recognizes that the ultimate criterion in determining admissibility is the perceived probative value of the proffered evidence weighed against its likelihood of undue prejudice. Unlike the *Frye* standard, however, McCormick urges that the decision be made by each trial judge on a case-by-case basis. Our rejection of this suggestion is set forth fully in the body of this opinion.

*See People v. Shirley*, supra, at 54–56, 181 Cal.Rptr. at 264–65, 641 P.2d at 796–97; *People v. Barbara*, 400 Mich. at 364–65, 255 N.W.2d at 180–81; *State v. Hurd*, 86 N.J. at 536–37, 432 A.2d at 91–92.

We must then determine how this evaluation is to be made. Obviously, in some cases testimony may be adduced in the trial court with regard to the technique, its nature, method and application. Such testimony may also describe the results in terms of reliability and uniformity. *See State v. Mack*, supra. "Ideally, resolution of the general acceptance issue would require consideration of the views of a typical cross-section of the scientific community, including representatives, if there are such, of those who oppose or question the new technique." *People v. Shirley*, 31 Cal.3d supra, at 55, 181 Cal.Rptr. at 265, 641 P.2d at 797. However, this does not mean that such witnesses must be actually produced to give their testimony. The language of the California Supreme Court on this point is particularly helpful:

> Accordingly, for this limited purpose [ascertainment of acceptance in the relevant scientific community] scientists have long been permitted to speak to the courts through their published writings in scholarly treatises and journals .... The courts view such writings as "evidence," not of the actual reliability of the new scientific technique, but of its acceptance *vel non* in the scientific community. Nor do the courts "pick and choose" among the writings for this purpose. On many topics—including hypnosis—the scientific literature is so vast that no court could possibly absorb it all. But there is no need to do so, because the burden is on the proponent of the new technique to

> show a scientific consensus supporting its use; if a fair overview of the literature discloses that scientists significant either in number or expertise publicly oppose that use of hypnosis as unreliable, the court may safely conclude there is no such consensus at the present time.

*Id.* at 56, 181 Cal.Rptr. at 265, 641 P.2d at 797 (citations omitted).

The technique described by the California Supreme Court is the method this court followed in *Mena* and in the original opinion in this case. There is no need to repeat here the exhaustive summary of articles on the use of hypnosis to refresh recollection. The reader is free to consult those opinions and the opinions in *People v. Shirley*, supra, and *Commonwealth v. Nazarovitch*, supra, for a review of the literature on the subject.

At this point, we need make only the following observations by way of summary:

1. The nature of hypnosis

> Although experts disagree about the many aspects of hypnosis, all concur that hypnosis is a sleeplike state whereby response to stimuli is more easily achieved than in a waking state.... Categorized as a state of heightened concentration, hypnosis is achieved by creating a passiveness in the subject .... The subject, with increased receptivity to instruction, is guided into a trance-like state through a series of suggestions from [5] the hypnotist. The hypnotized subject can be regressed to past times and places and recount the emotions and events experienced then. For this purpose, hypnosis has been utilized by prosecution and defense alike to stimulate recall ....

*Commonwealth v. Nazarovitch*, 496 Pa. at 108, 436 A.2d at 173.

---

5. Use of hypnosis to revive or refresh memory necessarily involves age regression. The subject is asked to put himself back to some earlier time, to visualize the events which transpired at that time and relate them to the hypnotist. It is then suggested to the subject that upon awakening he will recall that which he has been able to see, remember and relate to the hypnotist during the regressed state. An interesting aspect of the problem presented by hypnosis is that while the subject of age regression is often able to give a convincing description of that which allegedly occurred during the past event, experiments have shown that the technique of age *progression* can also be used during hypnosis. This technique involves telling the hypnotized subject that he is being transported to some specific time in the future. He is then asked to relate what he sees. Many subjects are able to give a very convincing description of what they "see" during such age progression. *See* Orne, *The Use and Misuse of Hypnosis in Court*, in 3 Crime & Justice 61, 77 (M. Tonry & N. Morris eds. 1981).

2. There are serious problems inherent in the use of the procedure. For example,

Two salient conditions that usually characterize the person who is in a hypnotic state or trance are *hypersuggestibility* and *hypercompliance....* Thus, the hypnotized individual is not only more easily influenced but is also more highly motivated to please others, most especially the hypnotist and those who are seen as associated with the hypnotist. Levitt, *The Use of Hypnosis to "Freshen" the Memory of Witnesses or Victims,* Trial, April 1981, at 56.

Thus, the hypnotized subject may not only have heightened recall of events he did experience, but may have pseudomemories of facts he did not experience but which were consciously or unconsciously suggested to him by the hypnotist or which he has actually fantasized or confused and transferred from other events and memories. These become part of his "recall" in an effort to satisfy his desire to fulfill the implied "demand" of the hypnotist to answer the questions asked during the hypnotic trance. This latter phenomenon is known as "confabulation." Thus, the more closely the hypnotized subject is questioned, the greater the danger that information produced will be inaccurate.

3. Once a person has been hypnotized, he becomes absolutely confident in the events as "recalled" during the hypnotic trance.

4. The most dangerous aspect of all is that

During the hypnotic session, neither the subject nor the hypnotist can distinguish between true memories and pseudo memories of various kinds in the reported recall; and when the subject repeats that recall in the waking state (e.g., in a trial) neither an expert witness nor a lay observer (e.g., the judge or jury) can make a similar distinction. In each instance, if the claimed memory is not or cannot be verified by wholly independent means, no one can reliably tell whether it is an accurate recollection or mere confabulation. Because of the foregoing pressures on the subject to present the hypnotist with a logically complete and satisfying memory of the prior event, neither the detail, coherence, nor plausibility of the resulting recall is any guarantee of its veracity.

*People v. Shirley,* supra, 31 Cal.3d at 65, 181 Cal.Rptr. at 271, 641 P.2d at 803 (citing Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness,* 68 Cal.L.Rev. 313, 333–35, 337–38, 340 (1980); Orne, *The Use and Misuse of Hypnosis in Court,* 27 Int'l J. Clinical & Experimental Hypnosis 311, 317–18, 320 (1979)).

These problems and the resulting ramifications were more completely discussed with complete citation to the medical literature in our opinion in *Mena* and in the original opinion in this case. Reexamination of the literature originally cited and examination of the most recent publications lead us to reaffirm our original conclusion that the threshold question of reliability must be resolved by precluding courtroom use of hypnotically recalled testimony.

This conclusion is reinforced by the trend in the most recent cases to refuse to follow *Harding* and its progeny. The cases, after exhaustive analysis, hold that hypnotically refreshed testimony is not *per se* admissible, rejecting the *Harding* proposition that the problems inherent to hypnosis go only to the weight rather than the admissibility of the evidence. *See People v. Shirley,* supra; *Polk v. State,* supra; *People v. Gonzales,* supra; *State v. Mack,* supra; *State v. Palmer,* supra; *Commonwealth v. Nazarovitch,* supra.

Thus, we reaffirm our previous determination that hypnosis has not received sufficient general acceptance in the scientific community to give reasonable assurance that the benefit of the results produced under even the best of circumstances will be sufficiently reliable to outweigh the risks of abuse or prejudice. We reject the *Harding* rule that hypnotically induced recall is admissible as a general matter and that the problems inherent in the use of the technique go to weight rather than admissibility.

Our previous decisions, however, went further and held that hypnotically induced testimony was inadmissible in any circumstance and for any reason. At this point, recent developments in the use of this evidence with appropriate "safeguards" deserve mention.

## THE USE OF HYPNOSIS WITH "SAFEGUARDS"

Several of the recent cases which have applied the *Frye* test have found insufficient acceptance in the relevant scientific community to permit application of a *per se* rule of admissibility, but have nevertheless adopted a rule involving limited admissibility under "safeguards." The nature of the limitations and of the safeguards varies from case to case, but is basically similar. The reason for the similarity is probably attributable to Dr. Martin T. Orne. Dr. Orne is referred to in many of the cases and in the hypnosis literature, and is the co-author of much of it. His stature and credentials in the field are rather remarkable.[6]

It is Dr. Orne's writings which are largely responsible for developing the techniques involved in the forensic use of hypnosis. In his initial and widely cited article, Dr. Orne reviewed much of the scientific literature and concluded that hypnosis could be a valuable tool for interrogation of witnesses to provide leads for the investigation of crimes. Orne, supra, at 85–86. He also stated that despite the considerable danger of production of pseudomemory, if trained mental health professionals used the technique properly on an appropriate subject,

hypnotically induced recall testimony could be of aid in the truth-seeking aspects of the case. *Id.* at 99–100. However, he urged that only testimony obtained in such a carefully applied procedure should be admitted. *Id.* at 99.

As a result of his original article and his testimony or affidavits in various cases, several courts concluded that the use of hypnosis as a procedure to increase recall had achieved such a degree of acceptance in the scientific community that, despite its inherent dangers, the testimony could be admitted. In each of these cases, the court imposed certain safeguards on the hypnotic procedure as a condition precedent to admissibility. In each of the cases, the safeguards are quite similar, primarily because directly or indirectly the safeguards were derived from Dr. Orne's outline of the conditions under which hypnosis should be performed and without which its results should be deemed unreliable. These safeguards are well outlined by the New Jersey Supreme Court:

> Whenever a party in a criminal trial seeks to introduce a witness who has undergone hypnosis to refresh his memory, the party must inform his opponent of his intention and provide him with the recording of the session and other pertinent material. The trial court will then rule on the admissibility of the testimony either at a pretrial hearing or at a hearing out of the jury's presence. In reviewing the admissibility of hypnotically refreshed testimony, the trial court should evaluate both the kind of memory loss

**6.** Dr. Orne is a Doctor of Medicine, Professor of Psychiatry at the University of Pennsylvania, Director of the Unit for Experimental Psychiatry at the University of Pennsylvania Hospital and Senior Attending Psychiatrist at that hospital. He also holds a Ph.D. in Psychology. He is Past-President of the Society for Clinical and Experimental Hypnosis, Past-President of the International Society for Hypnosis, and has been Editor of the International Journal of Clinical and Experimental Hypnosis. He has served as a reviewer of research proposals on hypnosis for the National Science Foundation, the National Institute of Mental Health, the Office of Scientific Research of the United States Air Force and the Office of Naval Research. He has been a consultant for a number of law enforcement agencies. He has been principal investigator of a major research group working on the nature of hypnosis and related phenomena since 1960. He has been a member of the editorial boards of various journals of psychiatry and psychology and has, himself, published over one hundred scientific articles. In addition, he has used hypnosis in clinical practice, has taught the subject and has carried out research on the nature of hypnosis. He wrote the article on hypnosis for the Encyclopedia Brittanica and has served as a witness on the nature of hypnosis, its acceptance in the scientific community and its reliability in many of the cases cited in this opinion.

that hypnosis was used to restore and the specific technique employed, based on expert testimony presented by the parties. The object of this review is not to determine whether the proffered testimony is accurate, but instead whether the use of hypnosis and the procedure followed in the particular case was a reasonably reliable means of restoring the witness' memory.

The first question a court must consider is the appropriateness of using hypnosis for the kind of memory loss encountered. The reason for a subject's lack of memory is an important factor in evaluating the reliability of hypnosis in restoring recall. According to defendant's expert, Dr. Orne, hypnosis often is reasonably reliable in reviving normal recall where there is a pathological reason, such as a traumatic neurosis, for the witness' inability to remember. Orne, *supra*, at 325. On the other hand, the likelihood of obtaining reasonably accurate recall diminishes if hypnosis is used simply to refresh a witness' memory or concerning details where there may be no recollection at all or to "verify" one of several conflicting accounts given by a witness. *Id.* at 324, 332. A related factor to be considered is whether the witness has any discernible motivation for not remembering or for "recalling" a particular version of the events. In either case, the possibility of creating self-serving fantasy is significant . . . .

Once it is determined that a case is of a kind likely to yield normal recall if hypnosis is properly administered, then it is necessary to determine whether the procedures followed were reasonably reliable. Of particular importance are the manner of questioning and the presence of cues or suggestions during the trance and the post-hypnotic period. . . . [citing Orne and others] An additional factor affecting the reliability of the procedure is the amenability of the subject to hypnosis . . . .

To provide an adequate record for evaluating the reliability of the hypnotic procedure, and to ensure a minimum level of reliability, we also adopt several procedural requirements based on those suggested by Dr. Orne and prescribed by the trial court . . . . *Before it may introduce hypnotically refreshed testimony, a party must demonstrate compliance with these requirements.*

First, a psychiatrist or psychologist experienced in the use of hypnosis must conduct the session. . . .

Second, the professional conducting the hypnotic session should be independent of and not regularly employed by the prosecutor, investigator or defense.

Third, any information given to the hypnotist by law enforcement personnel or the defense prior to the hypnotic session must be recorded, either in writing or in other suitable form. . . .

Fourth, *before* inducing hypnosis the hypnotist should obtain from the subject a detailed description of the facts as the subject remembers them. . . .

Fifth, all contacts between the hypnotist and the subject must be recorded. This will establish a record of the preinduction interview, the hypnotic session, and the post-hypnotic period, enabling a court to determine what information or suggestions the witness may have received . . . .

Sixth, only the hypnotist and the subject should be present during any phase of the hypnotic session, including the prehypnotic testing and the post-hypnotic interview. . . .

Once compliance with these safeguards is shown, the trial court can determine the reliability and therefore the admissibility of hypnotically refreshed testimony, according to the standards set forth above.

*State v. Hurd*, 86 N.J. at 543–46, 432 A.2d at 95–97 (emphasis added). Similar tests, some as complicated, some considerably shorter, but all based on Dr. Orne's suggestions, have been adopted in other cases. *See, e.g., Polk v. State*, supra (Maryland Court of Appeals remanded to the trial court for determination of general acceptance under *Frye*, stating that *if* it was

determined that the *Frye* requirement is satisfied, the trial court should then make a determination of other factors (most of which are similar to Orne's safeguards) which would determine the issue of admissibility, not merely weight; *State v. Mack*, supra (Minnesota Supreme Court reversed admission of hypnosis testimony but did not foreclose the "use of hypnosis as an extremely useful investigative tool" in providing new leads for solving crimes. The court further noted but did not adopt Orne's safeguards.); *People v. McDowell*, 103 Misc.2d 831, 427 N.Y.S.2d 181 (1980).

Thus, we are faced with three lines of authority. The first one is exemplified by *Harding*[7] and its progeny, holding that recall aided by hypnosis is admissible, and all problems inherent in its use go to the weight of the evidence. As noted above, we reject this approach to resolve the question before us. The second line of cases adopts a rule of total exclusion, and is exemplified by the following decisions from California, Michigan, Minnesota, Nebraska, and Pennsylvania: *People v. Shirley*, supra; *People v. Gonzales*, supra; *State v. Mack*, supra; *State v. Palmer*, supra; *Commonwealth v. Nazarovitch*, supra. This is the rule we adopted in *Mena* and in the original opinion in this case. The third line of cases adopts a middle road, finding that there is general acceptance in the relevant scientific community provided certain safeguards are followed. By and large, these courts have enumerated safeguards based on the Orne formulation and have held that if such safeguards are followed, the testimony may be admitted, leaving the jury free to hear and weigh all evidence the opponent of the testimony may offer regarding possibilities of pseudomemory resulting from suggestion, confabulation, or deliberate untruthfulness. *People v. McDowell*, supra; *State v. Hurd*, supra.

We must, then, determine which of these two remaining paths we should take. Before making this decision, we must turn to the literature and examine the current state of acceptance by the relevant scientific community. We note a recent article by Warner, *The Use of Hypnosis in the Defense of Criminal Cases*, 27 Int'l J. Clinical & Experimental Hypnosis, 417 (1979), advocating the admission of such testimony providing the "safeguards" are followed. In contrast, Dr. Diamond argues that the process is so unreliable that it has no scientific acceptance by knowledgeable psychiatrists and psychologists, so that recall testimony should not be admitted no matter what safeguards are applied and any witness who has been hypnotized should be declared incompetent for all purposes. *See People v. Shirley*, supra (citing Dr. Diamond extensively). Dr. Orne's position is of some interest:

> Hypnosis may be helpful in the context of criminal investigation and under circumstances involving functional memory loss. Hypnosis is not useful in assuring truthfulness since, particularly in a forensic context, subjects may simulate hypnosis and are able to lie wilfully even in deep hypnosis; [additionally and] most troublesome, actual memories cannot be distinguished from confabulations—pseudomemories where plausible fantasy has replaced gaps in recall—either by the subject or by the hypnotist without full and independent corroboration. While potentially useful to refresh witnesses' and victims' memories to facilitate eyewitness identification, the procedure is relatively safe and appropriate only when neither the subject nor the authorities nor the hypnotist has any preconceptions about the events under investigation. If such preconceptions do exist, hypnosis may readily cause the subject to confabulate the person who is suspected into his "hypnotically enhanced memories." These pseudo memories, originally developed in hypnosis, may come to be accepted by the subject as his actual recall of the original events; they are then remembered with great subjective certainty and reported

---

**7.** As indicated previously, the validity of *Harding* is now put in doubt by *Polk v. State*,

supra.

with conviction. Such circumstances can *create* convincing, apparently objective "eyewitnesses" rather than facilitating actual recall. Minimal safeguards are proposed to reduce the likelihood of such an eventuality and other serious potential abuses of hypnosis.

Orne, supra, Abstract at 61 (emphasis in original). Dr. Orne specifically points out that:

> As a consequence of [its] limitations, hypnosis may be useful in some instances to help bring back forgotten memories following an accident or a crime while in others a witness might, with the same conviction, produce information that is totally inaccurate.... As long as this material is subject to independent verification, its utility is considerable and the risk attached to the procedure minimal. There is no way, however, by which anyone—even a psychologist or psychiatrist with extensive training ... can for any particular piece of information determine whether it is an actual memory or a confabulation unless there is independent verification.

*Id.* at 72–73 (emphasis in original). Dr. Orne also notes that the type of induced recall most likely to lead to accurate revival of memory is that which is least useful in the forensic process: "[f]ree narrative recall [under hypnosis] will produce the highest percentage of accurate information but also the lowest amount of detail. Conversely, the more an eyewitness is questioned about details [while under hypnosis] the more details will be obtained—but with a marked decrease in accuracy." *Id.* at 77 (citing Hilgard & Loftus, *Effective Interrogation of the Eyewitness*, 27 Int'l J. Clinical & Experimental Hypnosis, 342 (1979).

One conclusion reached by Orne bears further mention: "We will show that as emphasis shifts away from the search for clues that will lead to reliable independent evidence and focuses more on helping to prepare witnesses to give eyewitness testimony, the difficulties that hypnosis creates for the administration of justice become increasingly greater." *Id.* at 85.

Orne concludes his article by warning that if there is even the "vaguest possibility" of using hypnotically enhanced recall at trial, certain safeguards must be followed. Since the use of hypnosis "can profoundly affect the individual's subsequent testimony" in a manner which is "not reversible," Orne concludes that "[i]f individuals are to be allowed to testify after having undergone hypnosis to aid their memory, a minimum number of safeguards are absolutely essential." *Id.* at 99. He then proposes the "Orne safeguards" which in one form or another have been adopted in those cases following the middle road.

In a recent symposium presented at the American Association for the Advancement of Science in Washington, D. C., Dr. Orne stated:

> There is an erroneous belief that hypnosis will tend to produce truth, though subjects can in fact lie under hypnosis, and much more importantly, may confabulate and believe the counter factual statements they have been led to "remember" by the hypnotic process.

\*      \*      \*      \*      \*      \*

> Good research will ultimately delineate those circumstances when hypnosis may be of use and indicate those instances when it is always dangerous. I have tried to take the best available data to formulate a series of safeguards which, if properly applied and enforced by the courts, will allow independent experts to assess whether a given witness has been tainted or permanently altered by the hypnotic process. There seems no doubt that without such safeguards individuals who have been hypnotized must not be allowed to testify in regard to those matters where the hypnotic session would have been relevant. Proper use of safeguards may demonstrate that in a given instance the individual should be allowed to testify despite the fact that he has been hypnotized, *but all the safeguards can ever do is provide the information necessary to make such a determination in a rational way.*

Orne, *The Effect of Demand Characteristics in the Context of the Forensic Use of Hypnosis*, 15, 18, in Influence of Hypnosis and Related States on Memory: Forensic Implications (January 1982) (symposium presented at the American Association for the Advancement of Science, Washington, D. C.) (emphasis added).

Another leading authority in the field is Dr. Herbert Spiegel of the Department of Psychiatry, College of Physicians and Surgeons, Columbia University. In a recent article, Dr. Spiegel stated:

> [T]he following conclusion is inevitably clear. All data obtained under hypnosis are vulnerable to the counterclaim of memory contamination or coercion (innocent or designed), even though incredibly accurate information can at times emerge. It is thus imperative to document all prehypnosis data as separate and distinct from information obtained during and after hypnotic interrogation. If this is not done, the prehypnosis testimony also risks losing its credibility. The most one can legitimately expect from hypnotic interrogation is further data, which may serve as *leads* for more conventional evidence gathering. *Data elicited through hypnosis by itself deserve low or no priority until they are supported by other data.* Even confessions of guilt made under hypnosis are vulnerable to counterclaims of coercion and deception, especially in demonstrably highly hypnotizable persons. This certainly does not hold for persons who are not hypnotizable and probably does not apply to those who test low on hypnotizability assessment tests.

Spiegel, *Hypnosis and Evidence; Help or Hindrance?*, 347 Annals N.Y.Acad.Sci. 73, 79 (1980) (emphasis added).

To summarize, then:

1. There is general support for the proposition that hypnotically aided recall is accepted and is valuable in the *investigation* of crimes and other events. Used for this purpose, it may provide clues which, when checked and verified, may lead to admissible evidence.

2. Hypnotically induced recall evidence should never be allowed unless the hypnotic session was performed under appropriate safeguards. Even then, such evidence may contain an inextricable mix of factual recall and pseudomemory in which the witness will have complete and sincere belief.

3. No matter how carefully the safeguards are followed, the risk of producing "recall" containing a mix of fact and fancy is high and to some extent unavoidable, while the finder of fact will have been deprived of the most important tools on which to base its judgment of credibility because the demeanor of the witness will have been irreversibly altered. The posthypnotic witness will provide testimony which is plausible, consistent and sincere, and in which he has absolute faith. There is no method by which even the best trained expert, the jury or even the witness himself can separate actual memory from pseudomemory. The effective use of cross-examination is impaired in violation of the rights guaranteed by the sixth and fourteenth amendments of the Constitution of the United States. *See State v. Mena*, 128 Ariz. at 232, 624 P.2d at 1280.

Viewed from the perspective afforded us by the foregoing analysis of the case law and review of the literature describing the present state of the art, the questions remaining are easily identified. The first question is whether, having rejected the *Harding* rule of *per se* admissibility, we should retreat from our previous position and follow the "middle road," adopting the New Jersey rule (*State v. Hurd*, supra) that hypnotically induced recall testimony may be admitted providing there has been strict compliance with court-formulated standards which will, hopefully, minimize the danger of pseudomemory. The second question is whether we should modify the rule announced in our original opinion in this case, that when a witness' memory of any part of an event has been "tainted" by the hypnotic procedure, that witness is rendered incompetent to testify for any purpose and with respect to any fact, even those remembered and related prior to hyp-

nosis. We answer the first question in the negative and the second in the affirmative.

## HYPNOTICALLY INDUCED RECALL TESTIMONY IS *PER SE* INADMISSIBLE

■ In deciding whether to depart from our rule of *per se* inadmissibility, we are faced with some of the same considerations of benefit vs. risk that we faced in connection with our rejection of the *Harding* doctrine of *per se* admissibility. We feel that the value of adopting a set of safeguards which, if followed, may permit the hypnosis procedure to cross the *Frye* threshold is minimal. This is acknowledged in the leading "safeguard case," *State v. Hurd*, supra. After setting forth the "Orne standards," the New Jersey court stated:

> Once compliance with these safeguards is shown, the trial court can determine the reliability and therefore the admissibility ..., according to the standards set forth above.
>
> ... We recognize that this standard places a heavy burden upon the use of hypnosis for criminal trial purposes. This burden is justified by the potential for abuse of hypnosis, the genuine likelihood of suggestiveness and error, and the consequent risk of injustice.... The burden of proof we adopt here will assure strict compliance with the procedural guidelines set forth in this opinion. It will also limit the admissibility of this kind of evidence to those cases where a party can convincingly demonstrate that hypnosis was a reasonably reliable means of reviving memory comparable in its accuracy to normal recall.

*State v. Hurd*, 86 N.J. at 546–47, 432 A.2d at 97 (footnotes omitted). The New York court also uses a version of the Orne standards, specifying nine safeguards which must be met, acknowledging the difficulty of meeting them, but stating that "hypnosis should be used only in rare instances and under the best possible conditions." *People v. McDowell*, 103 Misc.2d at 837, 427 N.Y. S.2d at 184. The State's position here is that standards such as those adopted in

*Hurd* should not be adopted in Arizona, but that the trial courts should be permitted to apply those or other proper standards to determine reliability of the proffered testimony on a case-by-case basis. This approximates the *Hurd* rule, but we are not persuaded that it is a wise practice.

To require the admissibility of hypnotically induced testimony to be determined on a case-by-case basis based on the testimony of expert witnesses produced by the parties, as required by *Hurd*, is neither sound nor practical. To compare the "recollections" of a witness whose testimony has been hypnotically induced to the "recollections" of an "ordinary" witness, and to determine whether the use of hypnosis was a feasibly reliable means of restoring memory comparable to normal recall in its accuracy, is virtually impossible.

The requirements for determining a minimum level of reliability for hypnotically induced testimony set out in *Hurd* are grounded upon the opinions and testimony of an eminent expert in the field of hypnosis. The same expert testified to essentially the same conclusions in the *Mack* case [*State v. Mack*, supra], and also testified that, in his opinion, a witness' testimony to a "memory" retrieved under hypnosis was infinitely less reliable as an indicator of truth than the results of a polygraph test. To base the admissibility of evidence in a given case on the testimony of competing expert witnesses imposes unjustified burdens on the criminal justice system in the field of hypnosis where the consensus of expert testimony indicates that no expert can determine whether memory retrieved by hypnosis or any part of that memory is truth, falsehood, or fantasy.

*State v. Palmer*, 210 Neb. at 217–18, 313 N.W.2d at 654–55.

The California court also considered the same question and "decline[d] to join in the foregoing effort to develop a set of 'safeguards' sufficient to avoid the risk inherent in admitting hypnotically induced testimony." *People v. Shirley*, supra, 31 Cal.3d at

39, 181 Cal.Rptr. at 254–55, 641 P.2d at 786–87. The court reasoned that not even the *Hurd* standards would forestall the dangers at which they were directed, that other dangers exist—such as causing the witness to lose his "critical judgment" and therefore to become certain of "memories" that before hypnosis he, himself, viewed as unreliable. The court commented:

[I]t takes little prescience to foresee that [the issue of whether the multiple safeguards had been complied with] ... would provide a fertile new field for litigation. There would first be elaborate demands for discovery, parades of expert witnesses, and special pretrial hearings, all with concomitant delays and expense. Among the questions our trial courts would then be expected to answer are scientific issues so subtle as to confound the experts.... Their resolution would in turn generate a panoply of new claims that could be raised on appeal .... And because the hypnotized subject would frequently be the victim, the eyewitness, or a similar source of crucial testimony against the defendant, any errors in ruling on the admissibility of such testimony could easily jeopardize otherwise unimpeachable judgments of conviction. In our opinion, the game is not worth the candle.

*Id.* at 40, 181 Cal.Rptr. at 255, 641 P.2d at 787.

The Michigan court sums it up well: Nonetheless, we do not believe that even the *Hurd* standards provide sufficient safeguards. While [they] would have the tendency to minimize distortion due to hypnotic suggestibility, our examination of the literature convinces us that, even following these criteria, substantial problems with confabulation, fantasy, and distortion would remain. Consequently, in individual cases, the *Hurd* standards might have an affirmatively detrimental effect. The standards, themselves, would give the hypnotic process an aura of reliability which, in actuality, it does not possess. It is far too likely that a jury would be even less critical of the testimony because of the indicia of reliability provided by such standards. We find nothing in the literature indicating in what percentage of the cases—under the most rigorous clinical standards—a subject's hypnotic memory later proves to be faulty.

*People v. Gonzales,* 108 Mich.App. at 159–60, 310 N.W.2d at 313–14.

We agree with these analyses. We feel that the case-by-case determination under a set of safeguards will consume too much in the way of judicial resources, will produce conflicting results in different trial courts, and will produce few situations in which hypnotic recall testimony is ever admitted;[8] even when admitted, there will still be substantial dangers of injustice because of the unavoidable risks attendant to the procedure and the present inability of even the most qualified expert to separate truth from fiction in such testimony. The problems inherent in separating truth from fiction and fact from fantasy in "ordinary recall" are already great enough that we see very little to be gained and much to be lost by adding to them. We see no way of avoiding, in some cases, infringement upon the constitutional right to cross-examination. We concur, therefore, with the courts in Minnesota, Michigan, Nebraska and Pennsylvania and adopt the words of the California court: "The game is not worth the candle." We reaffirm our previous holdings that hypnotically induced recall testimony is inadmissible. This is a rule of *per se* inadmissibility based on what we

8. One of the safeguards implicit in the Orne view is independent corroboration of the "facts" produced by the hypnotic procedure. Of course, in the great majority of cases the corroborating evidence will be independently admissible. It will be only the very unusual case where the hypnotically induced recall is necessary to establish the relevancy of the independent evidence. We deem it unwise to establish a rule of evidence, replete with cumbersome procedural safeguards in order to provide for the admission of foundational evidence useful in only the very rare case. In addition, the very imposition of such safeguards would be a substantial deterrent to the use of hypnosis for investigative purposes, a purpose which we think is the most beneficial to which the procedure can be put.

conceive to be sound public policy in the administration of the judicial system and in the oversight of the constitutional rights of litigants. To this extent, we reaffirm *Mena* and the original opinion in this case. However, the reexamination which we have undertaken has led us to reconsider the rule of outright incompetency adopted in our prior decisions.

## HYPNOSIS DOES NOT RENDER THE WITNESS INCOMPETENT TO TESTIFY TO THOSE FACTS DEMONSTRABLY RECALLED PRIOR TO HYPNOSIS

In its motion for rehearing, the State argues persuasively that hypnosis has received general acceptance in the scientific community as an investigative tool, that the effect of the incompetency rule is to render hypnosis useless for even investigatory purposes and to foster injustice by disqualifying witnesses from testifying for the purpose of establishing the very elements of the crime, even though there is no danger that such testimony was produced or influenced by the subsequent hypnotic session. For example, the State points out that there is no valid public policy for not allowing a rape victim to testify to the fact of rape even though she was subsequently hypnotized for the purpose of providing identifying "facts" which, after verification, might lead the police to apprehension of the criminal. Upon reexamination, we agree with this position.

We recognize that there are conflicting views on this problem. Dr. Diamond argues in his article (cited previously) for the rule of outright incompetency because of the "contamination" of the witness by the hypnotic process. However, our review of the literature and the position of law enforcement experts, lead us to conclude that hypnosis is generally accepted as a reliable investigative tool by the relevant scientific community. When used for prompting recall in order to provide valuable leads for investigation, hypnosis has less serious risks than the problems the technique presents when courtroom testimony is involved. Unlike a jury, an investigator need not make subjective evaluations of the truth or falsity of the hypnotic recall. He need only obtain leads for the purpose of subsequent investigation and verification.[9]

As a practical matter, if we are to maintain the rule of incompetency, the police will seldom dare to use hypnosis as an investigatory tool because they will thereby risk making the witness incompetent if it is later determined that the testimony of that witness is essential. Thus, applying the *Frye* test of general acceptance and weighing the benefit against the risk, we modify our previous decision and hold that a witness will not be rendered incompetent merely because he or she was hypnotized during the investigatory phase of the case. That witness will be permitted to testify with regard to those matters which he or she was able to recall *and* relate prior to hypnosis. Thus, for example, the rape victim would be free to testify to the occurrence of the crime, the lack of consent, the injury inflicted and the like, assuming that such matters were remembered and related to the authorities prior to use of hypnosis.

This position is supported by authority from those states which, like Arizona, have adopted the rule of *per se* inadmissibility of hypnotically induced recall testimony.

---

**9.** Another authority cited to us by the State is Elizabeth Loftus. In her recent book, E. Loftus, *Memory* 37 (1980), Loftus points out that memory is not akin to the operation of a computer where input is stored in some electronic circuit and can be reproduced intact. Memory does not remain in the brain in the same manner it was recorded. It is affected by the passage of time, by motivation, by confusion with memories of other events, and by self-delusion. False information becomes part of recollection. Memory is no more than a person's "current picture of the past." Thus, Loftus acknowledges that the "memory" produced by hypnosis produces a mixture of new, important facts and, all too often, "totally false information." *Id.* at 57. Nevertheless, Loftus indicates that occasionally the hypnotically produced recall can provide a valuable lead for investigation. Many examples of the use of hypnosis to uncover missing pieces of evidence for subsequent use in court are provided. *Id.* at 7, 55–59.

Thus, although Pennsylvania followed our previous rule, *People v. Nazarovitch*, supra, the recent case of *Commonwealth v. Taylor*, —— Pa.Super. ——, 439 A.2d 805 (1982) held that notwithstanding the *Nazarovitch* rule, the victim might testify to the fact that she identified both defendants as those who had raped her and that such identification occurred prior to the hypnosis session. The victim would not be allowed, however, to testify to the recollection produced by and through the subsequent hypnosis session. In *State v. Palmer*, supra, after adopting the rule of *per se* inadmissibility, the Nebraska court stated:

> If, for example, on remand it can be reliably determined what the witness . . . remembered previous to and independently of the hypnotic session, then that testimony, in my judgment, would be admissible. If it cannot be reliably determined, then all testimony concerning the "subject matter" of the hypnotic interview must be barred.

313 N.W.2d at 655. Similar results were reached in Michigan and Minnesota. *State v. Wallach*, 110 Mich.App. 37, 312 N.W.2d 387 (1981) and *State v. Koehler*, Minn., 312 N.W.2d 108 (1981). In these cases, the courts allowed witnesses to testify to prehypnotic recall, even though each state had previously adopted a rule excluding posthypnotic recall testimony. *See State v. Gonzales*, supra, and *State v. Mack*, supra.

We recognize, however, that there is danger even in allowing testimony of facts recalled prior to hypnosis, because the subsequent hypnosis does have an effect upon the witness' confidence in those facts. It is for this reason that we originally adopted Dr. Diamond's suggestion that any witness who had been hypnotized would be incompetent to testify for any purpose. We are persuaded, however, that with respect to investigatory use of hypnosis, the benefit does outweigh the danger. We also recognize that none of the other states which have adopted the rule of *per se* admissibility have gone as far as *Mena*. They allow a witness to testify to those facts which were demonstrably recalled prior to hypnosis. One has but to read the facts of *Wallach*,

supra, and *Koehler*, supra, to conclude that such a rule is necessary. Some of the attendant risks may be minimized by allowing cross-examination of the previously hypnotized witness in order to permit the opposing party to establish the fact of hypnosis and to introduce expert evidence showing the inherent possibility that the witness might have become subjectively certain of events only tentatively recalled before hypnosis.

We further minimize the risk by requiring that before hypnotizing a potential witness for investigatory purposes, the party intending to offer the prehypnotic recall appropriately record in written, tape recorded or, preferably, videotaped form the substance of the witness' knowledge and recollection about the evidence in question so that the prehypnotic recall may be established. Such recordation must be preserved so that at trial the testimony of that witness can be limited to the prehypnotic recall. If such steps are not taken, admission of the prehypnotic recall will be error, which, if prejudicial, will require reversal.

Further, parties intending to use hypnosis for investigatory purposes should make sure that the hypnosis procedure is performed in a manner designed to minimize the danger of contamination of both prehypnotic and posthypnotic recall. A record of that procedure should be made and retained. While we do not impose any particular set of standards for that purpose, we suggest that litigants adopt some, if not all of the Orne standards referred to above. Any litigant intending to offer testimony of a witness who has been hypnotized must make timely disclosure of such information to the court and to opposing counsel.

To those who may feel that we are overly apprehensive and cautious on the subject of hypnosis, we can only state that the law has long recognized that there are few dangers so great in the search for truth as man's propensity to tamper with the memory of others. The prevention of such an evil is necessary for the benefit of all, since hypnosis and other techniques are perhaps as

widely used by criminal defendants as by prosecutors. It is in the interest of the judicial system and of society as a whole that such risks be minimized. We are not unaware of Orwell's warning that control of the future depends above all on the training of memory to induce men to "remember" a doctored view of the past. G. Orwell, *1984* (1971). As Dr. Loftus points out, there is more harm than good to come from the "memory doctor." *See* Loftus, supra, at xiv.

The prayer for relief is granted and the case is remanded to the trial court to proceed in accordance with the original opinion as modified by this opinion on rehearing.

HAYS, Justice, concurring in part and dissenting in part:

I most heartily concur with that portion of the opinion which permits a previously hypnotized witness to testify as to pre-hypnotic recall.

However, I must dissent from the balance of the opinion which, after careful and exhaustive review of the subject, holds that hypnotically induced testimony may not be introduced in evidence. It is not necessary to adopt a per se inadmissible rule. Certainly, the ingenuity of our system can find safeguards which protect against the introduction of palpably unreliable testimony. Illustrative of this, we refer to the standards adopted in *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981), with an additional requirement that only hypnotically induced testimony which is corroborated by other independent evidence may be introduced. To totally slam the door on all hypnotically induced testimony, whether corroborated or not, I find to be unnecessary. On this issue I dissent.

GORDON, Vice Chief Justice (specially concurring in part and dissenting in part):

I cannot concur in whole with the majority opinion and must dissent from its modification of the original opinion in this case.

After the filing of both the original opinion of *State ex rel. Collins v. Superior Court,* 131 Ariz. 180, 644 P.2d 1266 (1982),

and the opinion on rehearing, my understanding of Arizona's position on the evidentiary use of testimony of a previously hypnotized witness is that: the witness is not totally incompetent to testify as a witness after hypnosis; (2) the witness can only testify posthypnotically to what he or she was able to recall before hypnosis; and (3) any recall of that witness in addition to, or different from his or her prehypnotic recall is still inadmissible as evidence, because (a) hypnosis as a procedure is scientifically unreliable as it does not presently satisfy the *Frye* test; (b) safeguards or standards on the use of hypnotic sessions do not make hypnosis reliable; and (c) any new recall that came after the hypnotic session is presumed to have been tainted by this unreliable process.

The opinion on rehearing modifies the law on hypnotically enhanced testimony by now ostensibly giving the witness the right to say on the witness stand what was remembered before being hypnotized.

As laudable as this concession by the new majority may be, this new facet of the law suffers from some obvious flaws:

(1) As stated by the majority in support of its argument that hypnosis causes unreliable recall, prehypnotic memory ceases to exist after the witness is hypnotized. The act of hypnotizing the witness does away with the witness's prehypnotic recall. The new memory may be influenced by purposeful or inadvertent suggestion, and embellished with confabulation and even lies. The new memory may be rigid and the witness may possess an unshakeable conviction that it is the correct version of the facts. See authorities cited in *State ex rel. Collins v. Superior Court,* 131 Ariz. 180, 644 P.2d 1266 (1982).

(2) The witness will frequently be required to testify as to a state of facts—the prehypnotic memory—in which he or she does not presently believe. Regardless of how improper it may seem to the witness or anyone else, the witness will be required to "stick to the script."

(3) The prosecution will have to instruct a witness what can and cannot be said on the witness stand. Coaching a witness [1] not to say what he or she presently believes to be the truth may run afoul of tenets of ethics this Court has promulgated. See DR 7–102(A)(4), (5) & (6).[2]

(4) The prosecution dares not question a state's witness beyond the facts included in prehypnotic recall without risking a mistrial or reversible error.

(5) The quandary of defense counsel is the worst of all. Defense counsel is limited on cross-examination in ways not only we as lawyers cannot understand but in ways upon which scientists knowledgeable in this field as yet do not agree. Defense counsel, in a legal sense, cannot adequately probe the prehypnotic recall on cross-examination because the witness no longer possesses the prehypnotic memory and because of the risk of bringing out additional recall tainted by hypnosis—which we say is so unreliable. The defendant's right to effectively cross-examine is thereby severely restricted. If the defense proceeds and if the new recall is damaging to the defendant, expert witnesses must then be put on in order to convince the jury that hypnosis has caused the new unreliable memory. If the new recall is favorable to the defense, the prosecution must now impeach its own witness by the same type of expert testimony.

I spare the readers from a lengthy repetition of my concerns for the potential violation of a defendant's right to effective cross-examination. See *State ex rel. Collins v. Superior Court,* 132 Ariz. at 187–189, 644 P.2d at 1273–1275 (1982). The majority fails to discuss or even mention this right that may be abridged in permitting testimony on prehypnotic statements in criminal trials. This unexplained omission is unjustifiable when treading upon a right that has been so carefully guarded by the United States Supreme Court.

(6) The rule the Court adopts adds to the judge's usual duties the obligation of making sure the parties understand the risks of straying from the script and then keeping track of whether anyone has. If a witness does stray and experts on hypnosis are called, then the judge must interrupt the trial to hold additional hearings to determine the competency of these witnesses and their testimony before it is offered to the jury.

The majority at p. 1296 requires that a prehypnotic statement be recorded and preferably videotaped and states the failure to do so will be error if prejudicial. I also dissent from this position and would require that all prehypnotic sessions be videotaped to insure against the possibilities of undisclosed suggestion. See *State ex rel. Collins v. Superior Court,* 132 Ariz. at 183–184, 644 P.2d at 1269–1270 (original opinion 1982). I would further require that the use of hypnosis at any stage of litigation be disclosed to opposing parties.

---

1. Witnesses are concededly coached not to mention other particular matters, *e.g.,* the fact of insurance in negligence actions, Gallagher agreements, receipt of funds from collateral sources, and subsequent remedial measures. Testimony is prohibited on these matters because it is wholly collateral to the issue before the court and may prejudice the trier of fact. In contrast, the testimony of previously hypnotized witnesses may go to the *very issue* to be decided. Witnesses must take the stand and mouth the prehypnotic statement even though they may have since clarified points or completely changed their minds. The jury may also become confused. A compromised witness is not a believable witness and the jury, picking up on the displayed lack of sincerity, may discount the entire performance.

2. "*DR 7–102. Representing a Client Within the Bounds of the Law*

   "(A) In his representation of a client, a lawyer shall not:

   \*    \*    \*    \*    \*    \*

   "(4) Knowingly use perjured testimony or false evidence.

   "(5) Knowingly make a false statement of law or fact.

   "(6) Participate in the creation or preservation of evidence when he knows or it is obvious that the evidence is false.

   \*    \*    \*    \*    \*    \*

I further dissent from the majority's position of merely suggesting that "litigants adopt, some, if not all of the Orne standards" to insure a taint-free hypnotic session. Merely suggesting standards is unfair to those who will use hypnotic techniques. I would not have litigants guess at which or how many standards would be enough to satisfy this Court that prehypnotic testimony was properly admitted. Clear adoption or rejection of standards may have drawbacks, but it is preferred to the foreseeable onslaught of appeals arguing what, if any, standards are sufficient.

Finally, I presume because the majority failed to address the prospective/retrospective application of the rule it sets today that the holding is prospective only. See *State ex rel. Collins v. Superior Court*, 131 Ariz. at 189–191, 644 P.2d at 1275–1277 (1982).

I specially concur with the majority on the issues of retaining the *Frye* rule and rejecting the adoption of standards or safeguards on the hypnotic process, that being my position in the original opinion in this matter.

The problems outlined above force me to dissent from the majority's position. The result of the majority's opinion will cast counsel, the court, and witnesses into new roles. To accommodate this change, the constitution, evidentiary rules, and lawyers' rules for professional conduct will need to be altered. Although it may be a sign of my age and/or the typical judicial resistance to change, I agree with the Supreme Court of California when recently it exhaustively considered the problems involved in hypnotically induced testimony and concluded "the game is not worth the candle." [3] *People v. Shirley*, 31 Cal.3d 18, 40, 181 Cal. Rptr. 243, 255, 641 P.2d 775, 787 (1982).

CAMERON, Justice (concurring):

I concur with Vice Chief Justice Gordon's special concurrence and dissent.

HOLOHAN, Chief Justice, concurring in part and dissenting in part:

There has been some small progress in undoing the unfortunate rule fashioned by *State v. Mena, supra.* I concur with that portion of the lead opinion which permits a witness to testify about matters recalled prior to being hypnotized. I dissent from the remainder of the opinion.

In my judgment the so-called *Frye* test has been misapplied in this case. As pointed out in my earlier dissent, it is not the answers given under hypnosis which are being offered. The results of the hypnotic session are not being offered as scientific evidence of a fact. The witness, himself, is being offered with the hypnotic session as just one of the many factors which affect a witness. The effects of hypnosis have been studied by the scientific community and conclusions reached. We are aware from these studies of the dangers in the process. The fact of hypnosis, in my view, should be a matter of weight with the trier of fact but not a disqualification. The recent decision by the Wyoming Supreme Court in *Chapman v. State, supra*, supports this conclusion.

Mr. Justice Hays takes a different approach to the admission of post-hypnotic testimony in that he would require the safeguards adopted in *State v. Hurd, supra*, and corroboration by other independent evidence. I believe this position is overly restrictive and unnecessary to assure reliability. It would appear to me that if the testimony of a witness was corroborated by independent evidence, that should be sufficient assurance of reliability without the necessity of additional safeguards.

The standards adopted in *State v. Hurd, supra*, are certainly reasonable and carefully drawn, and the adoption of such standards would appear far better than our present rule.

**3.** The court went on to hold that posthypnotic testimony is per se inadmissible.